Byron V. Seevers, Appellee, v. The Cleveland Coal Co., Appellant.

**Agency:** ACTION FOR COMMISSION: EVIDENCE. In this action for commissions for finding a purchaser for coal lands of defendant, the evidence is held to require submission of the question of whether plaintiff found a purchaser for the land, under the alleged agreement with defendant to do so for a compensation.

**Instructions:** DUTY OF JURY. It is the duty of the jury to follow an instruction of the court whether right or wrong.

**Instructions:** CONFORMITY WITH ISSUES. Where the petition alleged no agreement as to the amount of commissions to be paid for finding a purchaser for land, and there was no evidence that the reasonable value of the service was a certain percentage, but the evidence showed that a less percentage had been paid in such cases, an instruction that the measure of plaintiff's recovery was

a certain specified percentage of the purchase price was erroneous.

**Agency:** ACTION FOR COMMISSION: INSTRUCTION. In an action for commissions for the sale of land, in which it was admitted that the price of the land was not fixed and that plaintiff did not have the exclusive right of sale, an instruction that the fact that defendant did not know that the purchasers had been communicating with plaintiff about the land was not controlling, and that plaintiff had but simply to find a purchaser able, ready and willing to buy to be entitled to his commission, was erroneous.

**Same:** PROCURING CAUSE: INSTRUCTION. It is the duty of the court when it attempts to instruct upon a matter which the parties have raised by the evidence to give a proper instruction. Thus where there was evidence tending to show that at the time when the owner and the purchaser of land, claimed to have been produced by plaintiff, met to consider the matter, the owner was not aware that plaintiff had been corresponding with the purchaser or was instrumental in calling his attention to the lands, and the purchaser was not aware that the lands were those concerning which he and plaintiff had corresponded, the court should have instructed that if the jury so found then plaintiff could not be said to have brought the parties together, and was not the procuring cause of the sale.

**Same:** AGENCY CONTRACT: IMPLIED PROMISE TO PAY. Mere knowledge by the owner of lands that one in his employ is performing a particular service in procuring a customer, with the expectation of receiving extra compensation, is not sufficient to raise an implied promise of the employer to pay an additional sum; the employee must go further and prove an agreement for extra compensation.

**Same:** ESTOPPEL: RATIFICATION: PLEADING. A contract by ratification, or perhaps estoppel, may be proved under a general allegation that such a contract was made, although as a rule estoppel must be pleaded; as the question then becomes one of evidence to prove the contract rather than one of estoppel.

**Evidence:** DECLARATIONS AGAINST INTEREST: ADMISSIONS. Declarations or admissions of the adverse party may always be shown, whether written or made orally; and if in writing the other party may introduce all the correspondence on the subject. But generally self-serving declarations in whatever form are inadmissible; and the mere fact that a letter remains unanswered will not constitute an admission of the statements therein. In this action let-

ters written by plaintiff to defendant after the sale, which were self-serving, were inadmissible; and unanswered letters written some time after he quit defendants employ, and which were merely descriptive of past transactions, were not admissible to support a claim against defendant for salary and commissions.

Same: INCOMPETENT EVIDENCE: WAIVER OF OBJECTION. By introducing letters written to plaintiff, in response to letters from him improperly received in evidence, defendant did not waive its right to object to the incompetency of plaintiff's letters; since it was entitled to meet its case as best it could after introduction of the incompetent evidence.

Judgments: COUNTERCLAIM. Where the trial court properly directed the jury to credit the amount found due defendant on its two items of counterclaim against the sum found due plaintiff, it was not entitled to separate judgments on such items.

*Appeal from Wapello District Court.*—HON. FRANK W. EICHELBERGER, Judge.

WEDNESDAY, NOVEMBER 20, 1912.

ACTION to recover an alleged balance due on salary for certain alleged reductions obtained by plaintiff on coal options secured for defendant, and commissions for the finding of a purchaser for certain lands owned by the defendant in this state. Defendant filed an answer tendering an issue on each of these claims and setting forth certain counterclaims against the plaintiff. This counterclaim was in two counts or divisions, and thereto plaintiff filed a reply in which he admitted part of the items thereof and denied and explained certain others. On these issues the case went to a jury; the court instructing that plaintiff had not shown himself entitled to anything for salary. On the other issues, the jury found for defendant on plaintiff's claim to reductions from option prices; for the plaintiff on his claim to commissions, and for defendant on the two items of counterclaim, although the allowance on the second count was for less than was claimed. Defendant moved for judgment on

the items found in its favor on the counterclaims, but these were overruled, although the court deducted the amount of these allowances from the amount awarded plaintiff as commissions, and rendered judgment for plaintiff for the amount of these commissions so found, less the allowances to defendant on its counterclaims. Defendant alone appeals.— *Reversed* and *Remanded.*

*McNett & McNett* and *J. C. Mitchell,* for appellant.

*S. V. Reynolds* and *John N. McCoy,* and *Jaques & Jaques,* for appellee.

Deemer, J.—As plaintiff has not appealed, the first two counts of his petition are eliminated; the first by direction of the trial court, and the second by verdict of the jury. The jury found for plaintiff on the third count, and for the defendant on the two items of counterclaim, and, after deducting the allowances on the counterclaim, judgment was rendered against defendant in the sum of $15,357.86. Defendant's motion for a new trial was overruled, and the court taxed one-half the costs to each party. The appeal challenges many rulings of the court during the trial, and it is claimed that defendant was entitled to separate judgments on the two items allowed it by the jury on its counterclaim. That the exact issues on the third count of plaintiff's petition may be understood, it is necessary to refer to that pleading and its numerous amendments at some length. In the original petition, plaintiff alleged that, in virtue of an oral agreement between him and the defendant made on or about May 23, 1904, he was to have a 5 per cent. commission on any sale or for the procuring of a purchaser for any of the coal lands belonging to defendant; that he found a purchaser for certain tracts in Marion and Lucas counties which he had optioned for the defendant, and defendant made sales to this purchaser in September of the year 1905

for $302,150, and that his commission thereon amounted to $15,107.50. In an amendment to this count, he averred that his contract for commissions was made with one Glenn W. Traer, president of defendant company at Chicago, as alleged in his petition; that he procured the Consolidated Indiana Coal Company as a purchaser of the coal lands, or was instrumental in bringing purchaser and seller together: that, he interested Robert Lee and Carl Scholz, representing the purchasing company, in the lands; and that by means of his efforts with them the sales were made. In another amendment to this count he averred in substance that he, beginning in the year 1903 and continuing down to September 15, 1905, when the contract of sale was closed, was engaged in trying to find a purchaser, and that he finally succeeded in doing so, and that defendant sold the lands to the purchaser procured by him, to wit, the Consolidated Indiana Coal Company. He also averred, in this connection, that these services were extra and not covered by his regular contract of employment with defendant, and that the reasonable value of his services was 5 per cent. on the purchase price, or $15,107.

Defendant denied that it employed plaintiff to find a purchaser for its coal lands, and further pleaded settlements with and payments to the plaintiff for services performed by him of every kind and character. It also pleaded an accord and satisfaction. In its counterclaim it asserted that plaintiff had collected $700 in rentals for lands belonging to defendants, for which he had not accounted, and it asked judgment for that amount, less the sum of $13.71, paid by plaintiff on account of some repairs. In another count it pleaded that plaintiff, while taking options for coal lands in Marion county for one Osgood, had wrongfully appropriated to his own use, between January and October, the sum of $3,500, which amount was repaid by means of a loan received by plaintiff upon a note signed by a farmer with whom he had been negotiating for lands, as security, but that plaintiff failed and neglected to pay the interest on the amount used

by him, which amounted to the sum of $263.50, and as assignee of Osgood's claim for interest it asked judgment for the amount thereof.  Plaintiff admitted the receipt of the rents and said that he retained them to apply on his claim for commissions, etc.  As to the second count of the counterclaim, he admitted that he borrowed the money to replace the amount retained by him because he discovered this amount was a special fund, but he denied that he should be charged with interest.

In an amendment to his petition, and doubtless to meet some of the issues tendered by the answer, plaintiff averred:

That during the time that he was performing the services earning the commissions and the rebates for which this suit is brought, Glenn W. Traer was president of the Cleveland Coal Company, and also president of the. Whitebreast Fuel Company of Illinois, both of which companies were owned by the same stockholders, managed by the same board of directors, and were in fact a corporation within a corporation.  So far as plaintiff understood it, the Whitebreast Fuel Company was the holding company or the agent of the defendant company, and that, while the services for which he brings this suit were rendered, as claimed by him, for the Cleveland Coal Company, whatever amounts of money were paid him for wages, commissions, or rebates were paid through the Whitebreast Fuel Company of Illinois, and receipts and vouchers were made by him to that company, but as a rule the vouchers and receipts showed the proportion of the money so paid on behalf of the Cleveland Coal Company, the defendant herein. This amendment is made simply for the purpose of more clearly getting before the court and jury the exact situation.

To this defendant answered as follows:

It admits that, during the period for which plaintiff claims additional amounts for services rendered, the said Glenn W. Traer was president of the Cleveland Coal Company, defendant, and was also president of the Whitebreast Fuel Company of Illinois, but expressly denies each and every other averment stated in said amendment to petition, except

that it further admits that the plaintiff was paid for his services in full by the Whitebreast Fuel Company of Illinois, by which company he was employed and paid, and to which company he executed his receipts and vouchers for his services.

That one of defendant's pleadings may be better understood, we here quote therefrom as follows:

The defendant says that plaintiff was paid for his services, covering the period for which he sues, by the Whitebreast Fuel Company of Illinois, by whom he was employed. . . . Defendant says that plaintiff's contract with said Whitebreast Fuel Company of Illinois for services performed by him, and for which he was paid at the rate of $5 per day, was in parol, and was also implied from his acceptance and receipt from said Whitebreast Fuel Company of Illinois from month to month at the rate of $5 per day, and his statements of account rendered 'therefor. . . . The defendant says that between March 3, 1904, and April 3, 1905, no moneys were sent by either J. C. Osgood or the defendant to the plaintiff, but between said dates the Whitebreast Fuel Company of Illinois sent the plaintiff for and on its account with such J. C. Osgood about $59,000, and about $13,650 for or on its account with defendant. . . . Defendant says that at the time, and for the period stated, Glenn W. Traer was the president, and J. M. Blee was the treasurer and assistant secretary, of the defendant.

In this manner we have endeavored to extract the substance of pleadings covering about thirty-eight printed pages of the abstract. In some respects the issues are simple; but in going to the record which consists of an abstract of 739 pages, amended abstracts of a few pages, and briefs and arguments aggregating over 400 pages, that which might otherwise be regarded as simple becomes exceedingly complex. Involved in the transactions disclosed by the testimony are the following organizations: The Whitebreast Fuel Company of Illinois, an Illinois corporation, the St. Paul Coal Company, an Iowa corporation, the Cardiff Coal Company,

an Illinois corporation, the Crestline Syndicate, a group of
individuals operating in Polk county, or what is known as
the Des Moines field, the defendant, the Cleveland Coal Com-
pany, an Iowa corporation, and the Rock Island Railway
Company had a mining department and it cuts some figure
in the case.   In addition to these there was what is known
as the Consolidated Indiana Coal Company, a corporation,
the major part of whose stock and securities were held by
the Rock Island Railway Company.   This consolidated
Indiana Coal Company was the purchaser of the lands for
the sale of which plaintiff asks a commission.   The deed of
the lands to this company was made in September of the
year 1905.   Chas. A. Goodnow was general manager of the
Rock Island Company.   Mr. Mather was president, and a
Mr. Reid was the chairman, of its board of directors, Chas.
Scholz was manager of the mining department of the railway
company and general manager of the Consolidated Indiana
Coal Company.   G. W. Traer was president of the White-
breast Fuel Company of Illinois, and J. M. Blee was its
treasurer, and that company owned property both in Illinois
and Iowa, and operated the mines of both the St. Paul Com-
pany and the Cleveland Company, but each owned separate
properties which were not being operated.   Neither the St.
Paul nor the Cleveland Company operated any mines in
Iowa; the actual operation of their mines being carried on
by the Whitebreast Company of Illinois.   Traer was also
president and general manager of the defendant company,
and one Blee was treasurer.   It seems that the Whitebreast
Company, the St. Paul Company, and the defendant, Cleve-
land Company, were owned by the same parties, managed
by the same board of directors, and had the same general
offices.   The Whitebreast Company seems to have been the
operating company, and it seems that everything was cleared
through the Whitebreast Company, Traer the president,
said in his testimony:

All the companies (referring to the Whitebreast Fuel Company of Illinois, the Cleveland Coal Company, the St. Paul Company, and the Crestline Syndicate), were paid by or through the Whitebreast Fuel Company of Illinois; its vouchers were used; and the other companies were all operating through the Whitebreast organization, and the Whitebreast kept their bank account. All the expenses of the different companies were paid on Whitebreast vouchers, and we then charged to each company whatever was expended on its account. The Whitebreast Company from time to time had settlements and adjustments with these other companies on the amounts that were paid out for them; the entries were made right along from time to time, and the books balanced every month.

One John C. Osgood was a stockholder, probably the principal one, in both the Whitebreast and the defendant companies from the beginning down to the year 1906, and during part of the time was director and nominal treasurer; but, as already indicated, Traer was president of both companies, and had charge of the business thereof. It would seem that Osgood and Traer at one time owned practically all the stock in both companies. Osgood was a witness in the case, and he testified in part as follows: ·

As a result of a number of interviews and considerable correspondence with Glenn W. Traer, I authorized him to proceed to procure options in the so-called 'Belinda-Dallas field' to prospect the land if it proved valuable for coal to purchase the same, telling him that I would provide funds necessary for the expenses and purchase price of the property; the details of optioning and prospecting the property were left in Mr. Traer's hands, he reporting to me the progress of the work from time to time, and conferring with me frequently in personal interviews. In the first instance, it was my expectation to open a mine on the land, but later on I decided to dispose of my coal interest in Iowa as opportunity offered, and authorized Mr. Traer to find a purchaser for the various properties, including the 'Belinda-Dallas field.' He advised me of negotiations he had with Carl Scholz, and I authorized him to sell the 'Belinda-Dallas field' to Carl Scholz, or

the company he represented, at a price to net $300,000.
. . . I had nothing to do with the employment of
Byron V. Seevers in any capacity, but was advised by Mr.
Traer that Mr. Seevers was employed by the Whitebreast Fuel
Company of Illinois to procure options, and that he was using
him in the 'Belinda-Dallas' field at a compensation of $5
per day and his expenses. . . . I had no personal knowl-
edge of the employment of Byron V. Seevers, except as I was
informed by Glenn W. Traer. I was not informed that he
had anything to do with the prospecting or with the payment
for said lands or coal rights. . . . The optioning, pros-
pecting, purchasing, and sale of the so-called 'Belinda-Dallas'
coal field was a personal operation of my own, which I con-
ducted with my own capital, with the assistance of my business
associate, Glenn W. Traer, utilizing the employees and other
facilities of the corporations in Iowa in which I was interested,
in the Cleveland Coal Company, and the Whitebreast Fuel
Company of Illinois. I did not authorize or consent to the
employment of the plaintiff in the matter of negotiating a sale
or finding a purchaser for the property. I sold the property
myself to Daniel G. Reid in New York without any knowl-
edge on my part as to whether the purchase was made for him-
self personally or for any of the corporations in which he was
interested. . . . I understood from Mr. Traer that plain-
tiff was employed, under his direction, to procure options on
lands. I am not positive whether in the years 1903 to 1906
I held any official position with either the Cleveland Coal
Company or the Whitebreast Fuel Company of Illinois. I
may have been a director of one or both of those companies
for a portion of the time named. . . . Glenn W. Traer
resided in Chicago during that time, I think; my residence
was in Redstone, Colo. The companies during the time re-
ferred to maintained their offices in the Rookery building in
Chicago. Glenn W. Traer was president of both companies
and had general charge of their operations. He had charge
of the business of said companies in Iowa and Illinois. I have
no personal knowledge of who took options in 1903, 1904, and
1905 of the coal rights in Marion county, sometimes called
the Belinda-Dallas field, or who did the fieldwork, but was
informed by Mr. Traer that Byron V. Seevers was employed
under his direction to do some of this work. My best recol-
lection is that the options were taken in the name of Glenn

W. Traer, and that property, when purchased, was deeded to him.   Q. Do you know that when the deeds to these properties were made by the landowners they were made to Glenn W. Traer as grantee, and that Glenn W. Traer at a later date deeded them to the Cleveland Coal Company, and that the Cleveland Coal Company at a still later date deeded them to the Consolidated Indiana Coal Company?   A. I have no personal knowledge, but have been so informed.   Q. Please state who signed the deeds to the property in question when it was deeded to the Consolidated Indiana Coal Company, and what official position the signers occupied with the Cleveland Coal Company.   A. I cannot answer this question as I never saw the deed, but presume it was signed by the proper officers of the Cleveland Coal Company.   The Cleveland Coal Company did not sell the Belinda-Dallas field in Marion county direct to the Consolidated Indiana Coal Company.   I sold the property to Daniel G. Reid.   I cannot give the exact date the sale was made, but to the best of my recollection it was some time the latter part of July or August, 1905.   Q. Did the plaintiff, Byron W. Seevers, have charge of the optioning and purchasing of the property in question in the said Belinda-Dallas field for the defendant's company during the years in question?   A. He did not.   Glenn W. Traer had charge of the optioning and purchasing of the property for me.   I was informed by Glenn W. Traer that Seevers was in his employ for the purpose of doing field work in connection with securing options.   .   .   .   Under my direction, Glenn W. Traer had charge of the operations referred to, and, as already stated, advised me that plaintiff was in his employment, and was used by him in connection with procuring options in the Belinda-Dallas field.

This much by way of introduction.

Plaintiff claims that he made an oral contract with Traer as president and manager of the defendant company, whereby the said company agreed to pay him a commission for finding a purchaser for the options on the coal lands in Marion and Lucas counties, known as the Belinda-Dallas field, and so testified while on the witness stand.   He also introduced some letters from Traer which he claims corroborated his testimony.   He claims that the arrangements

were made early in the year 1903, and were brought about
because of his offer from other men to enter into their em-
ploy.  He further says that, pursuant to the contract, he
interested the officers of the Rock Island Railway in this
field, and brought about a meeting between Traer and these
officers, which finally resulted in a sale of the property to
the Consolidated Indiana Company, that company being
practically owned by the Rock Island Company, and that
the price obtained was something like $302,000, and he asks
either the sum of 5 per cent. as an agreed commission for his
work or the reasonable value thereof, which he stated in his
petition to be the same amount.  On the other hand, defend-
ant denies that it ever employed the plaintiff in any
capacity.  It says that he was employed by the Whitebreast
company at an agreed compensation for his services, which
did not include anything by way of commissions; that he
has been paid his salary and has receipted for the same.
That the land which was sold did not belong to the defend-
ant, but to Osgood, and that neither Osgood nor any one for
him ever employed plaintiff or agreed to give him any com-
pensation for finding a purchaser for the land.  It is agreed
that the corporate records show a purchase of the lands in
controversy by the defendant company from Osgood in Octo-
ber of the year 1904.  But Osgood said, as will be remem-
bered, that he used the employees of the Iowa companies in
securing his options, and some of the records show that cer-
tain payments for options were charged on the books of the
Whitebreast Company to the defendant company.  There
can be no doubt, under the testimony, that some time in the
year 1903 plaintiff undertook to interest the Rock Island
Railway Company, through its officers, in the coal field in
question, and that he had considerable correspondence with
these officials; that this continued down until the time of a
meeting of Traer with these officials, some time in March of
the year 1904, when it is claimed plaintiff directed the rail-
way officials to take the matter up with Traer for the reason

that they had officers in Chicago. However this may be, Traer met these officials at the time stated at Indianapolis, during a miner's convention, and then had with him maps and plats of the field, and there entered into negotiations to sell the land. Traer says in his testimony that he never knew that plaintiff had had any correspondence with these people, and that he was not advised of that fact by the plaintiff. It is conceded by plaintiff that the price for the lands was not fixed, and that this matter was left open for negotiations between vendor and purchaser. It is significant, however, that, when representatives of the railway company came to Iowa to personally look over the property, they were met by plaintiff, or at least were accompanied by him during a part of the time they were making their investigations. There is a sharp dispute in the testimony regarding Traer's knowledge of plaintiff's efforts to induce the railway people to buy the land. But, however this may be, defendant insists that the original negotiations never amounted to anything, were entirely broken off, and were thereafter resumed without any help from plaintiff, and the sale actually made at a much lower figure than was first proposed. This much of the testimony will be sufficient to indicate in a general way the points relied upon for reversal. To be accurate, these are thirty-seven in number, but they are finally reduced to seven or eight principal points.

I. It is argued that there was not enough testimony to take the case to the jury, and that in any event there should have been a verdict for the defendant upon plaintiff's claim for commission. We have set out enough of the record to indicate that we think the question was for a jury, and it is well established that we should not attempt to pass upon the weight of the testimony where there is a conflict therein. It may be that the preponderating weight thereof on the cold page is with the defendant, but this is not enough to justify us in reversing the case for want of evidence to sustain the verdict.

1. AGENCY: action for commissions: evidence.

In this connection, the trial court gave the following, among other, instructions: "(17) Before plaintiff. can be allowed a commission on the sale of the Belinda coal field, he must not only prove, by a preponderance of the evidence, that he was the cause of Traer and Scholz being brought together and entering upon negotiations, each with the other, with reference to the field, but he must also prove, by a preponderance of the evidence, that defendant had authorized him to find a purchaser for the field alone and by itself, and had agreed to pay him a commission if he would find a purchaser therefor—that is, though plaintiff may have been authorized to find a purchaser for, or to sell, the field in question along with and in connection with other fields all in a lump and not separately, yet in no event can he recover a commission on the separate sale of the field in question, without first proving, by a preponderance of the evidence, that the defendant authorized him to find and produce a purchaser for the field in question alone and by itself, and agreed to pay him a commission if he should find and produce a purchaser therefor." We have looked in vain for any testimony which would justify a verdict for plaintiff under this instruction, and plaintiff's counsel have not pointed out any such testimony.

We do not now see why this instruction was given; but, right or wrong, it was the duty of the jury to follow it, and, had it done so, plaintiff would not have been entitled to the verdict. *Crane v. Railroad Co.*, 74 Iowa, 330; *Eggert v. Templeton*, 113 Iowa, 266; *Nichols v. Railway Co.*, 69 Iowa, 154; *Mahoney v. Dankwart*, 108 Iowa, 321.

2. INSTRUCTIONS: duty of jury.

In another instruction the court said. "(24) If you find the plaintiff entitled to recover on the third count, the measure of his recovery will be 5 per cent. on whatever amount you find the purchase price to have been, with interest at 6 per cent. from the date of the sale, and, if you so find, you will compute the interest and return your verdict for said sum in one lump

3. INSTRUCTIONS: conformity with issues.

sum, as to count three of plaintiff's petition, not exceeding amount claimed in petition.'' This instruction cannot be sustained. It is true that plaintiff testified to an oral agreement to pay him 5 per cent. commission upon the purchase price, but he also alleged in his petition that there was no agreement as to amount, but that the reasonable value of his services was 5 per cent. There was testimony from which a jury might have found that no rate of compensation was fixed; but there was no testimony that the usual or customary rate or the reasonable value of these services was 5 per cent. True there was testimony of other sales where 5 per cent. was paid, but there was also testimony as to sales where less was paid. The question was, in any event, one for a jury, and the trial court was not justified in instructing, as a matter of law, that plaintiff was entitled to 5 per cent. on the amount of the purchase price.

II.   In its sixteenth instruction the court said:  ''The fact, if it be a fact, that the defendant or its president, Traer, did not know that Scholz and the Rock Island people had

4. Agency: action for commission: instruction.

been corresponding with Seevers about the sales of the lands is not controlling. It was no part of the contract. All he would be required to do, if you find that he was employed to find a purchaser for the lands, was to find some one who desired to purchase it, and who was ready, able, and willing to buy, or would in fact buy, and, if he did, the contract was fulfilled, regardless of defendant's information of what he had done.'' Under the facts disclosed and practically conceded that the price for the land was not fixed and that plaintiff did not have exclusive right of sale, this instruction was clearly erroneous.

The law on this subject is announced in the recent case of *Gilbert v. McCullough*, 146 Iowa, 333, and is as follows: ''The question presented is whether, conceding the facts to be as recited, the plaintiff found a purchaser within the terms of his employment. In *Rounds v. Alee*, 116 Iowa, 345, an

agent, having been employed to find a purchaser for land at a specified price, was held to be entitled to his commission if the efficient cause in procuring a purchaser, at the price named, to whom the principal sold, even though the principal knew nothing of what had been done; the agent not having had an opportunity of informing him. And this ruling is amply sustained by authority. *Lloyd v. Matthews,* 51 N. Y. 124; *Craig v. Wead,* 58 Neb. 782 (79 N. W. 718); *Hovey v. Aaron,* 133 Mo. App. 573 (113 S. W. 718); *Graves v. Bains,* 78 Tex. 92 (14 S. W. 256); 19 Cyc. 264. This case is to be distinguished from *Rounds v. Alee,* in that the sale was for a price less than that named to the agent, and, though the latter had submitted an offer equal to that received by the owner, he had withheld the name of the proposed purchaser. Had he submitted such name, there might be some question as to defendant's liability for the agent's commission, for the circumstance might be such that the owner might not avoid such liability by reducing the price to the customer furnished. *Steward v. Mather,* 32 Wis. 344. By withholding the name of the purchaser proposed, the agent voluntarily kept from his principal the knowledge which would have enabled the latter to protect himself as well as the agent, and therefore the latter, rather than the principal, was at fault. Even though the defendant may have agreed to employ no other agent, he retained the right himself to dispose of the property. *Ingold v. Symonds,* 125 Iowa, 82. This right was not obviated by the circumstance that another may have assisted him in effecting the sale, providing it was consummated before the plaintiff found a purchaser, for the agency of the plaintiff was thereby revoked. *White v. Benton,* 121 Iowa, 354. Possibly a party having the exclusive agency might have a cause of action for damages flowing from the breach of contract in employing another agent, but no claim of that kind is made. The action is for commission earned, and not for damages, because of the owner's lapse from his agreement in other respects. The sale was consummated

by defendant prior to ascertaining that the purchaser was the same person as the one for whom the offer had been submitted. As that offer was $75 less than the price at which he was to procure a purchaser, he did not thereby so perform as to entitle him to a commission. *Ryan v. Page,* 134 Iowa, 60. And as the sale was at a less price or one not specified in the agency agreement, and without knowledge that the purchaser was the person whose offer had been submitted by plaintiff, the defendant did not become liable to the latter for a commission. In *Boyd v. Watson,* 101 Iowa, 214, the price of the land for the sale of which the agency existed was not specified, and the court approved of an instruction that in these circumstances a sale to a customer of the agent, without knowledge of that fact, would not render the principal liable, for the commission claimed was approved. The distinction between the above case and *Rounds v. Alee* is that, in the latter, the price was named, and the sale effected at such price, while in *Boyd v. Watson* the consideration was a matter of negotiation. See, also, *Blodgett v. Railway,* 63 Iowa, 606. ''Power to fix the price is incident to the right retained by the owner to sell, and an agent necessarily must take this into account, and, unless he cares to assume the risk of a sale by the owner to a prospective purchaser on terms different than those specified, he must disclose such purchaser's name in submitting his proposition. Indeed, there is an element of bad faith in withholding this information from the principal, with whom the agent is required to deal with candor and fairness, and it must not be understood from the discussion that recovery might have been had, had the sale been at the price specified in the employment of plaintiff as agent.'' See, also, to the same point, *Boyd v. Watson,* 101 Iowa, 214; *Blodgett v. Railroad Co.,* 63 Iowa, 606. Also the following from Indiana which seems to be a well-reasoned opinion: *Mullen v. Bower,* 22 Ind. App. 294 (53 N. E. 790).

The following instruction asked by defendant on this same proposition should have been given:

(1-a) Before plaintiff can recover a commission on account of the sale of the coal field in question, he must establish, by a preponderance of the evidence, that he produced, as a prospective purchaser, to the defendant the party that did purchase; that is, that it was through his efforts that Mr. Traer and Mr. Scholz were brought together to enter upon negotiations as to the purchase and sale. Hence if in March, 1904, Mr. Traer and Mr. Scholz met and took up the consideration of the field in question, Traer acting for the defendant in offering to sell, and Scholz acting for his company as a prospective purchaser, and if at that time Mr. Traer had no knowledge that the plaintiff had been in correspondence with Mr. Scholz concerning a coal field in Marion county, and had no knowledge that plaintiff had called, or had been instrumental in calling, Mr. Scholz's attention to a coal field for sale in Marion county, and if at that time Mr. Scholz had no knowledge that the coal field he and the plaintiff had been corresponding about was the same coal field Mr. Traer was offering for sale, then you must find that plaintiff did not bring Traer and Scholz together, and was not the producing cause of the sale in question.

*5. SAME: procuring cause: instruction.*

The issue was in the case by reason of testimony having been introduced pro and con on this proposition, and the trial court, when it attempts to instruct upon a matter which the parties have made by the testimony, must give a proper instruction. *Hanson v. Kline,* 136 Iowa, 101.

III.   The trial court also gave the following instruction: "(11)   One acting without any authority therefor, from the owner of lands in finding a purchaser for such lands, is a mere volunteer, and in such case would not be entitled to a commission for such sale, even though his efforts may have been the efficient cause of bringing about the sale. But if the broker reports to the owner that he had begun such negotiations, and the owner of the lands knows that the broker expects a commission for obtaining such purchaser and approves the same, and makes the sale to such person with whom the broker had com-

*6. SAME: agency contract: implied promise to pay.*

menced such negotiations, then the broker, although a mere
volunteer at the commencement of the proceeding, would be
entitled to a commission.'' As applied to the facts, we do
not think this instruction can be sustained. According to
plaintiff's own testimony he was, during all the time when
claiming commissions for sales, in defendant's employ, and
doubtless owed it his entire time and energies. Of course his
employer could contract with him to pay additional compen-
sation for finding purchasers for his coal lands; but, from
mere knowledge that he was doing the work and expecting
compensation, no implied promise would, as we think, arise.
This proposition is ruled, we think, by *Welch v. Collenbaugh,*
150 Iowa, 695, wherein we said: ''The action of plaintiff is
necessarily based upon the alleged contract of employment.
His petition alleged such employment. The defendant's
answer denied it, and his testimony clearly negatived it.
There could be an employment without any express agree-
ment as to the rate of compensation. The contract of employ-
ment being proved, the rate of compensation could be de-
termined on quantum meruit. But this right of compensation
at all was dependent upon the question whether there was
any employment of the plaintiff by the defendant to procure
a purchaser for him. The defendant asked no aid of the
plaintiff, and refused all his solicitations for employment.
Upon such a state of facts, employment cannot be implied
from the mere fact that defendant knew that plaintiff was
about to take a customer to see the farm with a view of mak-
ing an offer for it. A property owner is not precluded from
engaging in conversation with an agent who solicits an agency
from him, nor is he bound to forbid an agent to look at his
property or to show it to a customer, in order to protect him-
self against liability.'' This thought was recognized by
plaintiff in his pleading, for he expressly averred that his
services were extra and not covered by his contract of hiring,
and that the reasonable value of his services were, etc.

A contract by ratification, or perhaps estoppel, may

doubtless be proved ·under a general allegation that such a contract was made. *Long v. Osborn,* 91 Iowa, 160. This is true, notwithstanding the rule that an estop-

7. SAME: estop-   pel must ordinarily be pleaded. The question
pel: ratifica-
tion: pleading.   is really not one ·of estoppel, but of the char-

acter of testimony to prove a contract. This may be done by conduct, and facts may be shown, under a general allegation of contract, from which an implied· one, or one growing out of conduct, or by ratification of the acts of another arises. See, to the same point, *Smith v. Bank,* 107 Iowa, 624; *State Bank v. Kelley,* 109 Iowa, 546; *Lull v. Bank,* 110 Iowa, 542; *Fritz v. Grain Co.,* 136 Iowa, 705. The trouble with the instruction lies, not in the fact that there was no pleading, but because, under the facts disclosed, it was erroneous as a proposition of law, for the very fundamental reason that plaintiff, as he claims, was then employed by defendant, and to recover commissions it was necessary for him to show an agreement for extra compensation.

IV. For the errors already pointed out, the judgment must be reversed, and we need not consider many of the other propositions relied upon. A vast number of letters passing between the parties named were offered and received in evidence, and to many of these defendant objected because ·self-serving in character and not in the form of admissions. Some of these letters were part of the *res gesta* of the sale or of the efforts put forth by the plaintiff in his claimed efforts to find a purchaser. Others were explanatory of letters received by plaintiff from various parties, and essential to· a complete understanding thereof, because they were a part of the correspondence with reference to a given subject, and were admissible as a part of the correspondence about the matters referred to. Some letters written by plaintiff were introduced, over defendant's objections, which contained nothing more than narratives of past transactions, and, so far as shown, were never answered by the parties to whom they are said to have been addressed. So, too, letters from plaintiff

to various parties were put in which purported to be answers to letters addressed to him without producing these letters or accounting for their loss or destruction in order that secondary testimony as to their contents might be given.

Of course declarations against interest or admissions of an adverse party may always be shown, whether in the form of letters or made orally. And in such cases the other party may introduce all the correspondence with reference to that subject.

8. EVIDENCE: declarations against interest: admissions.

But, as a general rule, self-serving declarations, whether in the form of letters or other statements, are not admissible. And the rule seems to be that the fact that an addressee fails to answer a letter does not make the letter admissible as containing admissions by silence. *Commonwealth v. Eastman,* 1 Cush. (Mass.) 189 (48 Am. Dec. 596) ; *Learned v. Tillotson,* 97 N. Y. 1-12 (49 Am. Rep. 508).

The general rule with reference to the admission of letters is as follows: " 'A letter written by a party is not admissible in his own favor, except as a notice or a demand.' 13 Am. & Eng. Ency. of Law, p. 259. Letters, written by the contractors to the city officials, did not tend to prove or disprove any issue in the case, and were clearly inadmissible. Such testimony tended to prejudice the minds of the jury against the city and in favor of the contractors. 'The mere fact that letters were received and remain unanswered has no tendency to show an acquiescence of the party in the facts stated in them. A party is not to be driven into a correspondence of that character to protect himself from such consequences.' In the case of *Firbee v. Denton,* 3 C. & P. 103, the plaintiff had sent a letter to the defendant, demanding a sum of money as due to him, to which no answer was returned. On the offer to prove its contents, . . . Lord Tenterton, C. J., observed: 'I am slow to admit that. What is said to a man before his face, he is in some degree called on to contradict, if he does not acquiesce in it; but the not answering the

letter is quite different, and it is too much to say that a man, by omitting to answer a letter, at all events admits the truth of the statements that letter contains. I am of opinion,' he observed, 'that this letter cannot be read.' *Hill v. Pratt*, 29 Vt. 119. In *Bank v. Dalafield*, 126 N. Y. 410 (27 N. E. 797), it was said: 'We can see no ground upon which the letter is admissible. It is not in the nature of a declaration, which the defendant admits by not answering; nor is it on the same plane as an oral declaration to the same effect, made in the presence of the party to be charged, and who may be regarded as admitting its truth by failing to deny it. This letter is a mere declaration of the writer, assuming in his own behalf to characterize and determine the nature of the past transaction, and it does not demand an answer, and is not admissible in evidence against the defendant. *Learned v. Tillotson*, 97 N. Y. 1, (49 Am. Rep. 508); *Talcott v. Harris*, 93 N. Y. 567.' In *Fearing v. Kimball*, 4 Allen (Mass.) 125, (81 Am. Dec. 690), it was said: 'The general rule that a party cannot make evidence for himself by his written communications addressed to the other party as to the character of dealings between them, or the liability of the party to whom they are addressed, in the absence of any reply assenting to the same, is well settled. . . . Omitting to answer a written communication is not evidence of the truth of the facts therein stated, nor is a party under ordinary circumstances required to reply to a letter containing false statements of facts. . . . A party cannot make evidence for himself by his own declarations. . . . The omission to answer letters written to a party by a third person does not show an acquiescence in the facts there stated, as might be authorized to be inferred in the case of silence where verbal statements were made directly to him.' *Waring v. United States Tel Co.*, 4 Daly (N. Y.) 233; *Child v. Grace*, 3 C. & P. 193; 1 Greenleaf on Evidence, section 199; *Moore v. Smith*, 14 Serg. & R. (Pa.) 393; *Robinson v. Fitchburg & W. R. Co.*, 7 Gray (Mass.) 92. In *Hammond v. Beeson*, 112 Mo. 190, (20 S. W. 474), it was said of the contents of

such a letter: 'These were declarations of a party in his own interest, and should not have been read in evidence to the jury. A party is not allowed in that manner to make evidence for himself.' In *Dempsey v. Dobson*, 174 Pa. 122, (34 Atl. 459, 32 L. R. A. 761, 52 Am. St. Rep. 816), it was said: 'The letter written after the plaintiff's color books had been returned to him, demanding that the copy that had been made should be given up to him, was inadmissible. It was an argumentative presentation of his view of his rights as an employee, and of the grievances of which he complained. It was unanswered. It was the declaration of the plaintiff in his own behalf, and was no more admissible because reduced to writing than it would have been if delivered orally.' " *City v. Mc-Kechney*, 205 Ill. 372, (68 N. E. 954).

Under these rules it is clear that Exhibit 84, a letter from plaintiff to Traer, written September 12, 1905, should not have been admitted. It was written after the sale was closed and was simply self-serving in character.

The entire group of unanswered letters from plaintiff to Traer, written many months after plaintiff had quit his employment with any and all of the companies and which were narrations of past transactions, should not have been admitted. We shall not undertake to point out all the objectionable letters. It is sufficient to state the rule that the parties may be guided thereby upon a retrial of the case.

Defendant did not waive the objections by introducing letters which were written by Traer in response to some of these. It had to meet the case as best it could, and, by introducing letters of the same import, it did not make plaintiff's letters competent. *Metropolian Bank v. Commercial Bank*, 104 Iowa, 682.

9. SAME: incompetent evidence: waiver of objection.

V. Defendant was not entitled to separate judgments on the two items of counterclaim found in its favor. The trial court correctly directed the jury to credit the amount thereof on the sum found due the plaintiff. Whether or not upon remand, in view of plaintiff's failure to appeal, defendant is entitled to judgment on these

10. JUDGMENTS: counterclaim.

two items allowed it on its counterclaim, we shall not now determine. As the case stood when the matter was passed upon by the trial court, defendant was not entitled to judgment on these items. The trial court has not yet been called upon to say whether defendant is entitled to judgment because of plaintiff's failure to appeal from this allowance made by the jury on defendant's counterclaims. It will be time enough to consider that matter after the trial court has had an opportunity to pass upon it. As has already been stated, the record before us is very large, and the facts complicated. We have done our best to grasp the salient points, and conclude that there must be a reversal for the reasons stated. However, it is practically conceded that the abstract is much longer than there was any necessity for, and we have concluded to tax one hundred pages of printed matter to appellant, and it is so ordered.

The judgment must be reversed, and the cause remanded for a retrial.—*Reversed* and *Remanded.*