HELEN M. BENSON, Appellee, v. MILDRED CUSTER et al., Appellants.

No. 46601.

MARCH 6, 1945.

REHEARING DENIED MAY 11, 1945.

Dyer, Jordan &,Dyer, of Boone, and Lehmann, Hurlburt & Hossfeld, of Des Moines, for appellants.

Doran, Doran & Doran, of Boone, and Guy C. Richardson, of Jefferson, for appellee.

SMITH, J.—Two farms in the same township are involved in this suit: one of two hundred forty acres in Section 21; the other of one hundred sixty acres in Section 34. We shall hereafter refer to them merely by section numbers.

Both farms belonged to Matthew Custer, Sr. at the time

of his death in 1927. He devised them to his son, John T. Custer, for life with remainder to John's two children, plaintiff Helen Benson and Dr. M. L. Custer, now deceased, late of St. Louis, Missouri. Dr. Custer is sometimes referred to in the record as Lee Custer, also known as Matthew L. Custer.

Upon the death of their father, John T. Custer, in 1933, plaintiff and her brother each became the owner of an undivided interest in both farms, and following the administration of his estate a division was made so that Dr. Custer became full owner of the land in Section 34. He died August 27, 1937.

I. On November 11, 1935, appellee and her husband executed to her brother a quitclaim deed (Exhibit A in the record) to her half interest in the farm in Section 21. The doctor at that time gave her his note for $7,200, which was afterward paid. The deed was delivered but never recorded. Appellee contends that Dr. Custer handed it back to her the same day, saying:

"Here Helen is the deed to the farm that I have talked to you about, that I want you to have, and the deeds to the other farm. The rest of the property and this farm I will send you up as soon as I can arrange for it."

Appellee's husband, Ralph Benson, so testified after first qualifying himself by the usual showing that he took no part in the conversation.

The trial court held the return of Exhibit A to appellee did not reinvest her with the title and ownership of the half interest involved in the transaction. She appeals from that part of the decree.

We do not find it necessary to pass on Mr. Benson's competency. We agree with the trial court that, "There is nothing in the record suggesting that at this time Dr. Custer had formed any intention of giving the plaintiff any land."

Even if the husband as a self-qualified witness be held competent so to testify we are not required to accept his testimony at face value. It seems unreasonable that the doctor would go through the idle formality of buying his sister's interest only to give it immediately back to her. The deed bore

$7.50 internal revenue stamps. There was an easier way to make her a present of $7,200 if that was the purpose.

We agree further with the trial court that it is more reasonable to suppose "Dr. Custer was concerned in concealing his interest in the Iowa land." Mr. Benson's testimony must be considered in the light of all the circumstances. As we said in Peck v. Foggy, 199 Iowa 922, 924, 925, 202 N. W. 754, 755:

" * * * the court is under special duty to scan and to scrutinize closely, and to put such evidence to every test of credibility available to it, in the record. * * * the court must be able to say that the evidence is not simply sufficient to make a prima-facie case, but that it is sufficient, in the light of all the circumstances, to carry conviction to the mind of the court, of its essential credibility."

See, also, Bosserman v. Watson, 230 Iowa 627, 298 N. W. 804; Peterson v. Citizens State Bank, 228 Iowa 219, 290 N. W. 546; and Holmes v. Connable, 111 Iowa 298, 82 N. W. 780.

Appellee argues that the voluntary surrender of an unrecorded deed by the grantee to the grantor, with intention of relinquishing all title conveyed thereby, accepted by the grantor with that understanding, "will estop grantee, or anyone claiming under him, from asserting any further rights thereunder." Brown v. Brown, 142 Iowa 125, 120 N. W. 724; Matheson v. Matheson, 139 Iowa 511, 517, 117 N. W. 755, 18 L. R. A., N. S., 1167; and Conway v. Rock, 139 Iowa 162, 117 N. W. 273, are cited in support of the proposition.

It will be conceded that if the other elements of estoppel are also present the proposition is sound. In the Brown case, supra, 142 Iowa 125, 133, 120 N. W. 724, 727, we added to the rule as stated by appellee this important qualification:

" * * * and accepted by the grantor as such relinquishment *in consideration of other agreements between the parties founded thereon * * *.*" (Italics supplied.)

The other cases cited by appellee are not in point and their language is not applicable here.

In the instant case there is no element of estoppel. There were no "other agreements * * * founded thereon" and no

change of position by appellee in reliance upon or caused by Dr. Custer's alleged act in returning the deed to her. He thereafter paid the consideration, received the income from the property, and kept up the taxes.

We affirm the decision of the trial court upon plaintiff's appeal.

II. The transaction of November 11, 1935, occurred at Jefferson, Iowa, and at the Benson home near there. Dr. Custer thereafter returned to St. Louis and on November 27th, executed and mailed to appellee two quitclaim deeds with no descriptions filled in. The letter accompanying them is not in evidence.

In one of these deeds, known in the record as Exhibit B, the description of an undivided one-half interest in the farm in Section 21 was later inserted, and in the other, Exhibit C, the description of the land in Section 34. As thus completed the deeds were recorded on November 29, 1935. They constitute the basis of appellee's present claim of ownership of the land in Section 34 and of the other one-half interest in the land in Section 21.

On November 29, 1935, the same day Exhibits B and C were completed and recorded, appellee and her husband signed and acknowledged two deeds back to Dr. Custer, one, Exhibit D, covering the land in Section 34; the other, Exhibit 1, purporting to cover an undivided half interest in the land in Section 21. Later the description in the latter was found to be slightly erroneous and a new deed (Exhibit E) was drawn, dated December 12, 1936, covering, however, the full interest in the land described.

Exhibits D and E were, after the doctor's death, turned over by appellant Mildred Custer to his Missouri executor, who caused them to be recorded on September 23, 1937. Appellee seeks to set them aside, claiming the delivery to Dr. Custer was conditional. From the trial court's decree in favor of plaintiff on this issue the defendants appeal.

At the time of these various deed transactions Dr. Custer was single. His wife had procured a divorce from him on June 10, 1934. She later remarried and is appellant Cecille Wielandy herein. Appellant Betty Lou Custer is their minor daughter

and appellant Boatmen's National Bank is trustee under Dr. Custer's will for the benefit of Betty Lou.

Before he died Dr. Custer married appellant Mildred Custer, née Stewart, on June 15, 1936. She had been his office nurse and secretary since 1933 and continued to work in his office until his death. His will, executed July 7, 1937, gave one half his estate to his wife Mildred and one half in trust to Betty Lou.

III. Before proceeding to the merits of defendants' appeal we are confronted by some questions of evidence. First, there is the testimony of Attorney Hutcheon, who filled in the descriptions in the deeds, Exhibits B and C, from Dr. Custer to appellee, and who drew the deeds, Exhibits D, E, and 1, from appellee back to her brother.

This witness testified that appellee and her husband brought Exhibits B and C to him on November 29, 1935, for completion, "for the purpose of placing the record title to the two farms owned by M. L. Custer out of his name and make it appear that the titles were in Helen M. Benson." He reiterated:

"I do know that I was told by them that the purpose of filling in these deeds and placing them of record was to make it appear upon the records that Lee Custer was not the owner of this real estate in order to prevent the levy of possible liens by the government for income tax purposes."

With reference to Exhibits 1 and D, he said:

" * * * my sole purpose * * * was to make them counter deeds to Exhibits B and C, and therefore I inserted in Exhibits 1 and D the same descriptions I did in Exhibits B and C."

Motion was made to strike the testimony of this witness as a confidential communication between attorney and client, incompetent under section 11263, Iowa Code, 1939. We do not find the point argued in the briefs on either side. At one stage of appellee's argument the witness is referred to as having been Dr. Custer's attorney when he filled in the descriptions in Exhibits B and C. The witness himself says he was acting as scrivener for Dr. Custer. Appellants in argument assume the admissibility of the evidence without arguing it.

It appears in Mr. Hutcheon's testimony that at one point in the conversation Mr. Benson made inquiry "as to whether there was any liability on their part in taking part in this transaction and I informed him that if he executed deeds back to Dr. Custer, so that the only change being made was to change the apparent record title, that I didn't believe that he would be in any difficulty."

Did this create the relationship of attorney and client between the witness and appellee? The mere fact that the witness was an attorney did not make communication to him privileged. Stoddard v. Kendall, 140 Iowa 688, 691, 119 N. W. 138; Crawford v. Raible, 206 Iowa 732, 739, 221 N. W. 474, 478.

In the last-cited case we said:

"It is sufficient to state that the testimony of an attorney as to a transaction in which two parties consult him, for their mutual benefit, is not privileged in an action between such parties or their representatives, involving such transaction. Mueller v. Batcheler, 131 Iowa 650; Stewart v. Todd, 190 Iowa 283."

The witness was primarily a scrivener in the transaction and so long as he retained that character communications to him were not privileged. Crawford v. Raible, supra; Ball v. James, 176 Iowa 647, 158 N. W. 684; Conway v. Rock, supra, 139 Iowa 162, 117 N. W. 273; Mueller v. Batcheler, 131 Iowa 650, 109 N. W. 186.

If it be considered that he momentarily stepped out of the character of scrivener and became an attorney, we still do not deem the communication privileged. The information was revealed primarily in the interest of both parties to enable the witness to carry out their purpose. The advice sought was incidental and presumably in the interest of both. The legal situation was analogous to what would have existed had Dr. Custer and the Bensons gone to the scrivener together and laid the facts before him.

In Hurlburt v. Hurlburt, 128 N. Y. 420, 424, 28 N. E. 651, 652, 26 Am. St. Rep. 482, it was said:

"It has frequently been held that the privilege secured by this rule of law does not apply to a case where two or more

persons consult an attorney for their mutual benefit, that it cannot be invoked in any litigation which may thereafter arise between such persons, but can be in a litigation between them and strangers.''

Defendants, claiming under Dr. Custer's will, were not strangers.

We hold the communication was not privileged.

IV. Objection was made, under the so-called ''dead man statute,'' section 11257, Iowa Code, 1939, to the competency of appellant Mildred Custer to testify concerning personal communications and transactions with Dr. Custer. Undoubtedly Mrs. Custer was incompetent under the statute if plaintiff (appellee) was one entitled to its protection. The question is not argued in the briefs.

The statute provides:

''No party to an action * . * * shall be examined as a witness in regard to any personal transaction or communication between such witness and a person * * * deceased * '* * against the executor, administrator, heir·at law, next of kin, *assignee,* legatee, devisee, or survivor of such deceased person * * *.'' (Italics supplied.)

Manifestly appellee could invoke the protection of the statute only if she was an *assignee.* No other of the statutory designations could apply to her. She was grantee in the deeds Exhibits B and C and grantor in Exhibits D and E. Her status in the transaction is the real subject of the suit. She claims ownership under Exhibits B and C and that Exhibits D and E represented a different transaction and were to become effective only under certain conditions that have failed.

Appellants contend the two sets of deeds represented but one transaction, that the title conveyed to appellee by Exhibits B and C was intended to be colorable only, and that Exhibits D and E were to enable Dr. Custer to retain actual ownership though the title .(by recording B and C and leaving D and E unrecorded) would apparently be in appellee. There is no claim that she was a purchaser for value in either case. She was at most a donee. Whether she was an assignee was the principal issue in the case.

We are all agreed that appellee under this record was not entitled to the protection of the statute as against the testimony of Mrs. Custer. Some would base their decision upon the reasoning of the opinion in McAleer v. McNamara, 140 Iowa 112, 112 N. W. 85, 117 N. W. 1122, while others would agree with the distinction drawn by the opinion written by Judge Bliss in O'Brien v. Biegger, 233 Iowa 1179, 1216, 11 N. W. 2d 412. All would arrive at the same result.

Under these circumstances we do not deem it necessary to attempt a reconciliation of the conflicting views. We dispose of the question in this manner the more readily because we are further agreed that, while Mrs. Custer's testimony concerning personal transactions and communications with Dr. Custer is important, our decision would be the same if it were excluded.

█ V. Another question of evidence arose on the trial and should be determined. Appellants offered and read into the record a part of the testimony of appellee in a former trial somewhat related to this and concerning the same deeds. Violent objection was urged to this evidence, based on the ground that the appellee was in the courtroom, that she had not testified, and that no proper foundation had been laid for its introduction.

The objection ignored the fact that appellee was party plaintiff and that any admissions against interest made by her were competent *as original evidence* against her. Seevers v. Cleveland Coal Co., 158 Iowa 574, 138 N. W. 793, Ann. Cas. 1915D, 188; Glass v. Hutchinson Ice Cream Co., 214 Iowa 825, 243 N. W. 352.

█ VI. We come to the merits of defendants' appeal. It is a fact question and depends on the intention of the parties. Either Dr. Custer sent Exhibits B and C to his sister with intention of covering up the real ownership without change of actual ownership; or, he sent them pursuant to some plan of giving the farms to his sister in order that eventually they would go to her son and remain in the "Custer line." Either Exhibits D and 1 (later replaced by Exhibit E) were conditionally delivered as claimed by appellee, or they were the instrumentalities by which Dr. Custer retained actual ownership without it appearing of record.

Appellee had the burden of proving by clear and satisfactory evidence that the deeds back from her to her brother were conditionally delivered. Corbin v. McAllister, 144 Iowa 71, 120 N. W. 1054; Hild v. Hild, 129 Iowa 649, 106 N. W. 159, 113 Am. St. Rep. 500.

.That D and E were manually delivered and remained in Dr. Custer's possession until he died is unquestioned. The witness Hager, a stock and bond salesman who in 1934 or 1935 became intimately associated with the doctor in business, was the principal witness for appellee. He testified he spent "an average of three or four hours a day with him"; that the doctor showed him Exhibits B and C before they were mailed to appellee; and counseled with and confided in him (the witness) that the purpose was to have the farm go to his sister as he wanted it kept in the Custer family. It is even indicated that the deeds were executed upon Hager's advice.

He testified that the next morning after the deeds were mailed the doctor said he was not quite satisfied, that "if his sister would die what would happen to the farm and I said it would go into the Benson estate and he said the reason he was giving it to her was he wanted it to stay in the Custer line and I said in a case like that have a quit claim deed prepared and have the Bensons sign it * * *."

The result was a long-distance call to Mr. Benson:

"He said over the telephone he wanted quit claim deeds brought back signed by Ralph and Helen. He told Ralph over the telephone to have the deeds fixed and bring them down."

In another part of his testimony Hager says the doctor told Benson to "bring them down to me and that Harry [the witness] will explain."

The next morning, or the morning after, the witness was in Dr. Custer's office (at 7:30) when Benson arrived with the deeds, Exhibits D and E. (Actually it was D and 1, E having been substituted for Exhibit 1 a year later.) According to both Hager and Benson, Hager, at the doctor's request, explained to Benson the purpose of the quitclaim deeds (as above indicated), whereupon Benson produced them and turned them over, not to the doctor but to Hager, who examined them and in turn delivered them to Dr. Custer.

Just why the doctor delegated to Hager the conduct of the whole transaction instead of attending to it himself is not plausibly explained. Certainly Hager, by his own account of the whole matter, displayed no special qualification for the purpose, whatever may have been his ability as a stock-market adviser.

There was an earlier case growing out of a claim filed by appellee and her husband against Dr. Custer's estate in the Iowa ancillary proceedings. Both Mr. and Mrs. Benson then testified that in the long-distance call from St. Louis the doctor said: "Ralph I am in a peck of trouble here and I would like to have you come down and bring a couple of deeds deeding them back to me, and when you come down here I will explain it in detail to you." Both of them testified they reported this telephone conversation to Attorney Hutcheon when they took the deeds Exhibits B and C to him to have them completed.

In the instant case Attorney Hutcheon testified that when the Bensons brought the deeds to him they informed him that the purpose of the whole transaction was to make the record title appear in appellee's name while the doctor retained actual ownership. We have held this testimony competent. If true, it shows that the whole plan was "to prevent the levy of possible liens by the government for income tax purposes."

That the doctor was attempting to "cover up" during that period of time is further indicated by the fact, stipulated in the record, that on November 27, 1935, the very day Dr. Custer sent the deeds to his sister, there appeared on the books of the witness Hager's employer (A. G. Edwards & Sons) an account under the fictitious name Lee Hamilton, which showed "a long list of securities totaling $146,117.43 transferred from the Custer account," and that it bore the memorandum: "M. L. Custer has authority to trade in this account." Dr. Custer's mother's name was Hamilton. His own middle name was Lee.

It is true Mr. Hager testified on rebuttal that, "There are many lawyers and bankers who trade and carry the account under other names," and that "all accounts with a balance of over $20,000 were reported to the government." But the opening, by Dr. Custer, of an account under a fictitious name at

the very time when his land in Iowa was being transferred to his sister's name indicates too clearly an identity of purpose in the two transactions.

The letter that accompanied the deeds sent up by Dr. Custer is unfortunately lost. No witness professed to know its contents except that Mr. Benson said: "The contents of that letter, I know, instructed her to get the descriptions." Possibly, if produced, it would throw light on the transaction. The telephone message from the doctor had been already received by Mr. Benson before they took the deeds to Attorney Hutcheon. It is reasonable to infer that was the source of the information they gave Hutcheon as to the purpose of the transaction, if indeed it was not contained in the missing letter.

Benson inquired of Hutcheon whether there was any possible liability that they might incur in the transaction. The question of such possible liability would never have arisen if the transaction had been as now claimed by appellee. It would, however, very naturally arise if the purpose was to conceal from the government the actual ownership of the land.

The whole transaction was proceeded with hastily. Benson took Exhibits B and C over for record while the deeds back to Dr. Custer were being drawn. He thinks he took the train that evening to St. Louis with the deeds he and appellee had signed.

The ever-present and resourceful witness Hager had his own explanation of this haste:

"Q. What was the hurry about having all of this done so it had to be done at once? A. Well the only explanation that I can give as to having the mailing of the deeds signed by Matthew L. Custer in blank was that the matter was before us and it was to get it done now and out of the way. I happened to be mentioned here [as] a fellow that likes to get it over and get it done now."

He modestly assumed full credit—or blame—for the haste.

He testified that in the long-distance telephone to Benson (already referred to) Dr. Custer told Mr. Benson "to get those deeds over there on record right away and to bring down quit claim deeds."

There is much more in the record to discredit appellee's present theory of the nature of the transaction. We have already referred to earlier litigation in which the merits of the present case were at least indirectly involved. Prior to the commencement of the former case by appellee and her husband against the Iowa executor of the Matthew L. Custer estate (see In re Estate of Custer, 229 Iowa 1061, 295 N. W. 848) appellee filed in Greene county a petition for the probate of her brother's will as a foreign will. In that petition she alleged under oath:

" * * * that there is situated in Greene County in the State of Iowa and under the jurisdiction of this Court, certain property belonging to said estate and disposed of by said will, said property consisting in part of the following described real estate, towit: [describing the land in question here] and the rents now accrued and unpaid thereon * * * That your petitioner * * * is the owner and holder of a valid and existing claim against said estate and is therefore interested therein."

Pursuant to that petition the will was admitted to probate and S. J. Sayers, an attorney of Jefferson, Iowa, uncle of decedent and appellee, and named in the will as one of the executors, was appointed executor. Mr. Sayers qualified and reported the real estate involved here as belonging to the estate. Appellee and her husband thereafter filed claims against the estate which were the subject matter of that earlier litigation.

Appellants pleaded and urged these facts as constituting an election of remedies by appellee. We do not find it necessary to pass on that proposition. The facts constitute strong and persuasive evidence that appellee's present contention is an afterthought. She attempted here to avoid the inevitable inference to be drawn from her former conduct by claiming she acted on advice of Mr. Sayers. But she did not attempt to say that she laid before her uncle the facts or the theory which she now presents to the court. It is inconceivable that Mr. Sayers, with information of the contention now made by his niece, would have permitted her thus to swear that these lands were a part of Dr. Custer's estate and disposed of under Dr. Custer's will. Her failure to inform him of what she now

claims was the true situation is significant and cannot be ignored in appraising this record.

We are not overlooking the testimony of Dr. Williams, a dentist friend of Dr. Custer, who told of conversations with decedent. He testified the doctor told him his federal and state income-tax matters were all settled by or before November 1, 1935.

The witness testified that when decedent was in the hospital about ten days before he died he was much disturbed about his will, that he did not trust the man he had named as executor, that he wanted the witness to act as executor, that he was disturbed about the provisions he had made for his daughter and that he had taken care of his sister (appellee) "amply outside of the will." We have always held that such testimony should be cautiously received and that it is of little weight. Williams v. Harrison, 228 Iowa 715, 722 et seq., 293 N. W. 41; In re Estate of Rich, 199 Iowa 902, 200 N. W. 713; Makinson v. Shumick, 196 Iowa 980, 193 N. W. 407; Boeck v. Milke, 141 Iowa 713, 718, 118 N. W. 874, 120 N. W. 120.

The will had been drawn a little more than a month prior to this alleged conversation. Mr. Hager also testified to a similar conversation with decedent about the same time in which the doctor wanted *him* to "act as executor and as trustee for his little girl." We do not attach importance to the alleged sudden change of mind concerning the executor. The fact remains that no change was made in the will.

Nor are we overlooking the testimony of the witness Hager as to the doctor's repeated admonitions to him, both in and out of the presence of appellant Mildred Custer, to make sure the deeds, Exhibits D and E, would be destroyed and appellee's rights protected, and of his and Mildred's continued promises to the doctor that it would be done. Reading his testimony, we are tempted to paraphrase Shakespeare's much-quoted line, and say: "The witness doth protest too much."

When interrogated as to the fact that after the doctor's death he (the witness) did nothing about the deeds, Mr. Hager explained that when he learned ("when the doctor was passing away") of the doctor's marriage to Mildred, he assumed the doctor's wishes would be carried out by her.

Appellant Mildred Custer testified at considerable length as to the custody of the deeds, Exhibits D and E, and as to many details of the doctor's business. She denied explicitly the testimony of Mr. Hager as to any statements of Dr. Custer in her presence concerning the purpose of the deeds. They were kept in a lock box to which she had access and after the doctor's death she produced them and delivered them to the Missouri executor, Walter Wehrle.

It was stipulated in the record that Mr. Wehrle, if present, would testify as to certain statements made to him by Dr. Custer concerning the purpose of the deeds and his (Dr. Custer's) conversations with Mr. Benson concerning them. The record does not make it clear in whose behalf this evidence was offered but we assume, notwithstanding its place in the record, that it was a part of appellants' case. It was objected to as incompetent, irrelevant, and immaterial. We are inclined to the opinion that, if offered on behalf of appellants, the statements were objectionable as self-serving declarations of the doctor, not available to appellants claiming under his will. At any rate, we do not take the testimony into account in making our decision.

In Partello v. White, 197 Iowa 24, 28, 196 N. W. 719, 721, we said:

"The instrument * * * with no conditions appearing upon its face, had been in the possession of the deceased grantee during his life, and was found among his papers after his death. * * * Under such circumstances, a delivery to the grantee will be presumed, and the burden of showing a want of delivery, or a conditional delivery, is upon the party so claiming. McGee v. Allison, 94 Iowa 527; Witt v. Witt, 174 Iowa 173; Potter v. Potter, 185 Iowa 559; Hild v. Hild, 129 Iowa 649; Nowlen v. Nowlen, 122 Iowa 541; Conway v. Rock, 139 Iowa 162; Stiles v. Breed, 151 Iowa 86; Mathers v. Sewell, 193 Iowa 35."

We are compelled to disagree with the conclusion of the able trial judge that the two sets of deeds represented separate transactions and that on the facts "plaintiff has rather the better of it." We view the execution of the two sets of deeds as one transaction. It is true Exhibits B and C were signed

and acknowledged in St. Louis on November 27th, and the others in Jefferson on November 29th. But the time element alone is not conclusive. The variance in time was merely an incident to the fact that the parties were separated by distance and had to deal by correspondence.

Even under appellee's theory of the transaction it is clear that the giving back of the deeds by Bensons was the condition upon which they were to accept the deeds from Dr. Custer. If that was not stated in the missing letter it was made a condition by the doctor's long-distance telephone message before the deeds were completed and made effective.

Hager's explanation of the whole transaction is not convincing. He said the plan was to make certain that the Iowa land would remain in the "Custer line" or "Custer family" or "Custer name." But the doctor was in good health. He had a daughter whom he loved to the extent of leaving one half his property for her benefit. There was no immediate danger that the property would pass out of the "Custer line." Reminded of the fact that the doctor's daughter was a "Custer," the witness says the doctor "made the assertion that Donald Benson [appellee's son, fourteen years old] was the only living male heir and he wanted the farm to go to * * * him."

If the plan was for Donald to have the property, any intelligent layman could think of more reasonable and direct ways to accomplish the result. And how could the method adopted insure it, even under appellee's theory? A return of the deeds, D and E, to appellee after her brother's death would still leave possible the very contingency the doctor is claimed to have feared. We think the evidence points to a more reasonable explanation—the one undoubtedly believed by appellee and her husband in the other case. At any rate, it is quite clear she has failed here to meet the burden of proof necessary to set aside the deeds to her brother.

There is much more in the record that might be mentioned. It is undisputed that Dr. Custer received the rentals and paid the taxes on this land during his life. Appellee testified, over objection as to her competency, that she told her brother he should have the rent and out of it should pay the taxes. She

says this conversation was at the time he gave her the deeds, Exhibits B and C, but the record clearly shows she and Dr. Custer were not together at that time. Something is attempted to be made by appellee of the letter, Exhibit L, written by Mildred Custer to appellee shortly before Dr. Custer's death, in which she said:

"He made a suggestion and I am in favor of it 100%—that is that he leave his farms to Donald so they will stay in the family and it is a tradition that I want to see carried out."

This was nearly two years after the deeds in controversy were made. It does not bear out appellee's contention here. It does show that Dr. Custer was considering the idea of giving the farms to appellee's son, but it also indicates quite clearly that he believed himself still to be the owner of them and that he had not as yet done anything to destroy his own power of disposition.

Appellants contend that the theory of appellee would result in construing the deeds to be testamentary in character and that the claimed condition connected with their delivery would be against public policy. It is not necessary for us to pass on this defense. Nor is it necessary to review other details of the evidence, of which there are many. What we have said indicates that the decree in appellee's favor must be reversed.

There is on file a motion by appellee to strike appellants' reply argument as having been filed four or five days too late. We can see no prejudice to appellee in the delayed filing and the motion will be denied. Flickinger v. Farmers Mut. F. & L. Ins. Assn., 136 Iowa 258, 113 N. W. 824; Bennett v. City of Emmetsburg, 138 Iowa 67, 115 N. W. 582.—Affirmed on plaintiff's appeal; reversed on defendants' appeal.

All JUSTICES concur.