Peter P. Coughlin et al., Appellees, v. St. Patrick's Church
of Tama, Appellant (and three other cases).

**DEEDS:** **Validity—Undue Influence.** A deed will not be set aside on
1    the ground of undue influence unless it is made to appear that, at
the time the deed is executed, the will of the grantor was so over-
come by the will of another that the act amounted to a substitution
of the will of such other for the will of the grantor. Evidence held
insufficient to show such influence.

**DEEDS:** **Validity—Mental Incompetency.** Courts must be zealous to
2    guard the right of every man to dispose of his own property as
he sees fit, so long as he has the mental capacity (1) to know what
property he possesses, (2) to know what he desires to do with it,
and (3) to exercise his free and voluntary will in such disposition.

**Headnote 1:** 18 C. J. pp. 236, 237, 445. **Headnote 2:** 18 C. J. pp.
219, 443.

*Appeal from Tama District Court.*—B. F. Cummings, Judge.

May 12, 1925.

Opinion on Rehearing June 21, 1926.

Actions in equity by the heirs of a grantor, to set aside
certain conveyances of real estate on the grounds that the same
were obtained by undue influence, and that the grantor was
mentally incompetent to execute the same. The trial court
granted the relief prayed in each of the cases, and the de-
fendants appeal.—*Reversed.*

*H. J. Ferguson, James H. Willett, George Cosson,* and
*Harold H. Newcomb,* for appellants.

*Struble & Stiger,* for appellees.

Faville, C. J.—I. Many years ago, three brothers and a
sister came to America from Ireland. They were poor, and en-
countered the vicissitudes familiar to immigrants of their class.

One of the brothers married, and subsequently
died, leaving the appellees surviving him as his
sole heirs at law. The two brothers Daniel and
Robert and the sister, Mary, never married. Daniel and Robert

1. DEEDS: valid-
ity: undue
influence.

purchased a small tract in the vicinity of Clutier, in Tama County, and lived upon it, with the sister, Mary. They were thrifty, industrious, and economical, and their original holdings grew until the brothers became the owners of two farms, aggregating 560 acres. About 1900, they retired from the farm, and moved to the city of Tama, where they purchased a tract of land and constructed a home. Sometime thereafter, the sister died, and the two brothers continued to live in the residence, keeping their own home. Daniel died on or about April 7, 1919. The surviving brother, Robert, continued thereafter to live in Tama, part of the time in the hotel, and part of the time in his own home, until about April 1, 1922, when he went to Clinton, to the home of his niece, Honora Gesland, where he remained until the date of his death, January 5, 1923.

The deeds involved in this suit were executed March 30, 1922, and are four in number, and dispose of all of the real estate owned by the said Robert at the date of said deeds, except about 20 acres. He had previously executed and delivered a deed to his home in Tama to Catherine Sheridan, one of the appellants herein, and her husband. The grantor had no heirs except the appellees. Appellee Peter is married, and resides at Madison, Wisconsin. Appellee Honora Gesland is also married, and resides at Clinton, Iowa.

After the death of his brother Daniel, the grantor had lived at different places until about December 23, 1921, when the Sheridans, by arrangement with Robert, moved into the latter's home, and he continued to live with them thereafter, and they took care of him until he went to live with his niece at Clinton, about April 1, 1922.

The brothers Daniel and Robert owned all of the real estate and personal property jointly. The 560 acres of farm land and the house and lot in Tama were valued at $134,323.50. The personal property was valued at $10,246, or a total of $144,569.50. Daniel having died intestate, owning one half the property, the interest of Robert therein was a three-fourths interest.

We first consider the question of undue influence in the procurement of the deeds in question. The grantor was a devout member of the Catholic church, at Tama. Appellant

Baxter, at the time of the transactions in question, was the priest of said church. He had been such priest since about 1918. He was acquainted with the grantor, and had called upon him on a number of different occasions; but the evidence fails to show that the relationship between the grantor and Baxter was intimate. Robert and his brother Daniel had been very generous contributors to said church. In regard to the particular transaction in question, the evidence shows that Robert went to the priest's house and talked with him about making a disposition of his property. The testimony in regard to what was said between the parties, at the time, of necessity comes solely from the lips of appellant Baxter. It appears that, at said time, Robert told Baxter, in effect, that he desired to dispose of his property for charitable purposes, except one tract of land, which he wished to give to Sheridan and his wife, with whom he was living. He talked over with Baxter the disposition he should make for the charitable purposes. He wished to help in the education of children, and other benevolences of the Catholic church. He produced the deeds and abstracts to his premises, and designated to Baxter the particular tracts which he wished to convey to the different parties. In this conversation, he expressed to Baxter a desire to deed one tract of land to the priest, to be held in trust by him, and used for the poor and needy, and such benevolent calls as might be made upon the priest. According to Baxter, he expressed to him, at the time, a desire to retain a life estate in all of the property, and to have the full use of it so long as he should live. On the following day, Baxter went to one Hyland, an attorney at Tama, at the suggestion of Coughlin. Hyland had been the attorney for Coughlin for a number of years. He had done the legal work in connection with the administration of the estate of the brother Daniel, and had been Robert's legal adviser in regard to said matter, as well as in respect to his personal affairs. Baxter explained to Hyland the deeds Coughlin wished to have made, giving him the descriptions of the various tracts of land, as Coughlin had given them to him, and explained to Hyland that the grantor was to retain a life estate in the various tracts. It appears that, at this time, Hyland inquired of Baxter why Coughlin did not make a will,

instead of executing the deeds; and, while there is some conflict in the evidence, it is Hyland's contention that Baxter stated that there were many ways in which a will could be broken, and, besides, he understood that a party could not will more than twenty-five per cent of his estate to a charitable institution. In any event, Baxter left the matter with Hyland, to draw the deeds, which Hyland did, and sent them to Baxter's home, by his stenographer, the same day. On the following day, Baxter returned to Hyland's office with the deeds, and explained to Hyland that the deeds were not in conformity with the wishes of Coughlin, and did not comply with the directions he had given Hyland in regard to the trust; and part of the deeds were corrected by Hyland. They were signed by Coughlin at the priest's house that afternoon. Coughlin went from his home to the business part of town with Dr. Whalon, who was treating him, and with Sheridan, with whom he lived. Baxter called at Hyland's office that afternoon, and told him that Coughlin had signed the deeds, and that he was then at Dr. Whalon's office; whereupon Hyland went to Whalon's office, where Coughlin was with the doctor and Sheridan, taking the deeds with him. He presented each of the deeds to Coughlin, and asked him, in regard to each one, if it was his voluntary act (or words of similar import), and received an affirmative answer from Coughlin. He took the deeds to his office, and delivered them to Baxter, after having placed revenue stamps thereon and canceling the same. It also appears that Hyland telephoned the recorder's office, to see if it was open, and that Baxter took the deeds to the recorder's office, with Sheridan, and filed the same for record. Sheridan later telephoned the recorder not to file the deed to him for a while, and it was not recorded until sometime later. Hyland claims that, at the time he left Whalon's office, after taking the acknowledgments of the deeds, Sheridan told him that "this was Father Baxter's doings, and that he had double-crossed me, too, and that the deed to his wife would never be recorded." Sheridan was not a witness.

It appears that, at the time Baxter returned the deeds to Hyland for correction, he called the latter's attention to the fact that the deed to him (Baxter) was not in trust, but that

it was a full warranty deed. Baxter's contention is that he told Hyland, at the time, that the deed to him should be changed, to show that he held the property only in trust, for benevolent and charitable purposes; and his contention is that Hyland told him, at the time, that it was not necessary to make such a change, because Baxter understood what Coughlin wanted, and would carry it out. There is a dispute in the record with regard to this conversation; but, in any event, on the following day Baxter went to Hyland, and had the latter draw his will, which was duly executed at said time, and by the terms of which he disposed of the property deeded to him, for charitable and benevolent purposes of the Catholic church. It further appears that he filed a pleading in this cause, whereby he denies any personal interest in the land conveyed to him, and seeks to have the deed reformed, showing that he holds the property in trust for benevolent and charitable purposes for the Catholic church. The evidence in the case also tends to show that, at the time the deeds in question were executed, there was little, if any, intimacy between appellees and Coughlin. Both of said appellees were married, and lived at distant points. There is no evidence of any correspondence between the parties, and no proof of frequent visits. Gesland, the husband of one of the appellees, had seen Coughlin but a few times, and Peter, the appellee living in Madison, Wisconsin, had first seen Robert at the time of a funeral, in 1913, and again at a funeral in May, 1919, and at the time of Daniel's death, in March, 1919. These were the only times, prior to the execution of the deeds. There is evidence that the grantor had expressed to different people, on a number of different occasions, his intention to give his property to charity, and also evidence tending to show that he had expressed himself to the effect that he did not intend to leave any of his property to his niece and nephew, the appellees.

We have not attempted to set out in detail all of the evidence in the case bearing upon the question of undue influence. We have taken into consideration, in connection with this question, all of the testimony in the case with regard to mental incapacity, which is, of course, proper to be considered in connection with the question of undue influence. The rule

is familiar and well established in this state that, before a conveyance will be set aside on the ground of undue influence, is must appear that, at the time of the execution of the conveyance, the will of the grantor was so overcome by the will of another that the act amounted to a substitution of the will of another for that of the grantor. *Mallow v. Walker*, 115 Iowa 238; *Perkins v. Perkins*, 116 Iowa 253; *Henderson v. Jackson*, 138 Iowa 326, and cases cited therein.

Appellees' contention is that the alleged undue influence was exerted on the mind of the grantor as the result of a conspiracy between Baxter, Sheridan, and Dr. Whalon; and that, acting in concert, these three parties secured the execution of the deeds in question, and substituted their wills for that of the grantor. The trial court so found; and a careful examination of the entire record in this case leads us to the conclusion that we cannot concur in the finding of the trial court on this question. There is no evidence whatever that Whalon had any interest of any kind in securing the execution of any of the deeds in question, other than might be inferred from the fact that he was a Catholic, and a member of St. Patrick's Church, in Tama.

It appears from the record that Coughlin was suffering with a double hernia; that Dr. Whalon went to the home to treat him, and brought him in his own conveyance to his office, where he examined him and consulted with him in regard to the matter of an operation for the hernia, and the possibility of relieving the same by a truss. It was while he was engaged in this examination for this purpose that Hyland appeared at the office with the deeds, and took the acknowledgment of Coughlin, in the presence of Whalon and Sheridan. There is nothing to indicate that Whalon knew anything about the deeds until the moment when Hyland appeared at his office with them. There is nothing in the record upon which to support a finding that Whalon used any influence in procuring the deeds, except the barest inference to be drawn from the fact that he brought Coughlin to his office, was present when Hyland brought the deeds there for acknowledgment, and that he was a member of the church that is a beneficiary of one of the conveyances.

In regard to Baxter, while it appears that he was the priest of the church to which Coughlin belonged, it does not appear that his relations with Coughlin were intimate, or that he had in any way importuned or advised Coughlin with regard to the execution of the conveyances in question. On the contrary, it affirmatively appears that Coughlin went to the priest and told him of his intentions and desires in regard to the execution of the instruments, and advised the priest that Hyland was his attorney, and that he should go to Hyland to have the deeds drawn. This Baxter did. Hyland was intimately acquainted with Coughlin, and had been his attorney for years, and had had charge of much of his business, and knew fully in regard to his property and in regard to his physical and mental condition. Knowing this, he not only drew the deeds for the conveyance of the property, but thereafter took the acknowledgment of the instruments by Coughlin in formal manner, and telephoned the recorder's office and arranged for their recording, after he had himself placed revenue stamps on the instruments and canceled them with Coughlin's initials. Baxter was not present when the deeds were acknowledged before Hyland, nor is there any evidence that he used any compulsion, coercion, or undue persuasion in procuring the execution of the instruments.

So far as Sheridan is concerned, the evidence of undue influence is much more persuasive in behalf of the appellees than in regard to the other parties. He had more motive for exercising such influence, and was in a better position to exercise it. It does not appear, however, that Coughlin reposed undue confidence in Sheridan, or that Sheridan had power or influence over him. Sheridan and his wife had made a good home for Coughlin, and were caring for him well. He undoubtedly depended upon them for the kind administrations which he coveted in his old age, and which were not apparently available to him from any other source. He had, by a previous deed, conveyed to Sheridan and his wife the home property in Tama. This deed had been drawn by Hyland, and acknowledged before him by Coughlin. The remark testified to by Hyland as having been made by Sheridan the day the deed in question was acknowledged, is scarcely sufficient to jus-

tify a finding of undue influence in the execution of the deed, under all of the facts and circumstances shown.  The deed in question does not run to Sheridan at all, but to his wife; and there is no evidence whatever of any attempt to procure the execution of the deed in question on her part.  She testified in the case.

Upon the whole record, we conclude that the finding of the trial court that the deeds in question were procured by undue influence on the part of Sheridan, Whalon, and Baxter is not sustained by the evidence.

II.  A more difficult question, however, confronts us in regard to the mental competency of the grantor at the time of the execution of the deeds.  As is usual in cases of this character, the record is very voluminous, and many witnesses testified upon both sides of the controversy.  It is impossible, within the reasonable length of an opinion, to review in detail this large amount of testimony which we have examined by a careful reading of the abstract.

2. DEEDS: validity: mental incompetency.

The age of Coughlin, at the time these deeds were executed, is somewhat uncertain from the record.  Appellants contend that he was about seventy-five years of age; and the appellees, that he was between eighty-five and eighty-seven.  In any event, he was an old man.  He was in bad condition physically.  For a long number of years, he had been a sufferer with double hernia, which caused him distress.  He was always odd and peculiar.  He did many eccentric, peculiar, and sometimes unreasonable things.  It is quite evident that the diligence of counsel has brought before us in the record all of the available evidence of instances manifesting oddities or eccentricities or peculiarities that would indicate his mental condition.  He became forgetful, and was egotistical and sensitive.  It appears that he insisted, after the death of his brother, that he owned all of the property that they had owned jointly, and objected to the payment of any collateral inheritance taxes out of the estate, or the Federal estate tax.  He and his brother Daniel did not carry a checking account at the banks, but deposited money on certificates of deposit; and when he wished to draw money, he would take the certificate to the bank and

receive the amount of cash wanted, and take a new certificate of deposit. At one time he wished to draw $100 from the bank, and signed a check for that amount. He afterwards denied that he had signed the check, and claimed that the cashier of the bank had stolen the money from him. He lived in a hotel in Tama, and sometimes lost his way to his room, and inquired where his room was. He sometimes lost money from his pocket, and in one instance he paid a bill and required a receipt, which he lost, and twice thereafter sought and obtained a receipt for the same bill. There is evidence tending to show that, when he was a younger man, he was neat and careful about his appearance and dress, and that he became negligent and careless in this regard. There is, however, a dispute in the evidence on this question. He sometimes paid a bill and evidently forgot that he had done so, and attempted to pay it again. A family by the name of Loftus kept house for him at one time, and there was a dispute in regard to money that he loaned to Loftus with which to buy a cow. There is also evidence that he would flip coins, to determine the outcome of matters, and that he sometimes blessed himself. Although a devout Catholic, he sometimes forgot it was Friday, and would eat meat on that day. He went to a barber shop without a top shirt on, and wearing his coat and vest over his underwear. He lost $60 in a chair in the hotel lobby; and when the wife of the hotel proprietor found it and returned it to him, he became angry, and accused her of stealing the money. He built a barn on one of his farms in the summer of 1921; and when he received a bill for the lumber, he wanted Hyland, his attorney, to go with him to the bank to borrow the money with which to pay for it. Hyland explained to him that he had some $1,700 in the bank, and he did not believe it, until shown the certificate of deposit. The money was taken out of the certificate of deposit; and it appears that he later requested Hyland to go to the bank with him to pay a note which he said he owed for the money with which he had paid the lumber bill. It is claimed that his eyes became lusterless and his gait shuffling, and that he lost control of the natural functions of his body. There was a large amount of evidence of various details of the general character of the evi-

dence we have referred to. We have not attempted to set it all out, nor to refer to the different items, but have considered them all. The evidence relied upon by appellees with regard to mental incapacity is directed largely to a time after the execution of the deeds in question. It appears that, within a day or two after the deeds in suit had been executed and recorded, both of the appellees herein arrived at Tama, and the appellee Mrs. Gesland took Coughlin with her, back to her home in Clinton, where he remained until his death. The testimony in behalf of appellees comes largely from people who saw him during the succeeding months, as he gradually declined, until his death the following January. During this time he was examined by one physician, on May 18, 1922, and again on the day of his death. The physician was called to treat Coughlin with regard to the hernia with which he was afflicted. He examined him with regard to the hernia and the treatment of the same by the use of a truss. The physician expressed his opinion that Coughlin was suffering from senile dementia, and that he "would easily be subject to imposition in business transactions," in his opinion. Another physician who resided in Clinton, and who lived near the home of the Geslands, testified that he frequently saw Coughlin, and had different conversations with him. He expressed the opinion that he was afflicted with senile dementia, and was of unsound mind. The cross-examination of this witness disclosed that he was not the attending physician of Coughlin; that he never examined him but once, which was a short time before he died; and that he then had the appearance of approaching pneumonia. Another medical expert testified, in answer to a hypothetical question, that in his opinion one in the condition described in the hypothetical question would be of unsound mind. It further appears that Coughlin had stated at one time that he was renting his farm at $20 an acre, when in fact it was rented for $7.00; and that, when he was examined as a witness in the guardianship matter, in the fall of 1922, he stated, at said examination, that he had $65,000 of Liberty bonds, when in fact he had no Liberty bonds then, and had never had but $5,000. Against this testimony is evidence from a large number of witnesses who were acquainted with

Coughlin prior to the execution of the deeds in question, and most of whom had known him for many years. Dr. Whalon, who attended him as his physician, and in whose office the deeds were acknowledged, testified, from his examination of Coughlin, that in his opinion he was of sound mind. There is testimony in the record of witnesses who had known Coughlin for a long number of years. They include people in various walks of life: people with whom he did business; neighbors who were intimate with him for many years, and knew his peculiarities and observed his method of living. Some were tenants who had been on his farm, and others who had transacted business with him. While he is described as being eccentric and peculiar in many ways, these witnesses unite in the opinion that he was of sound mind, and was shrewd in business matters and in driving a bargain. These witnesses on the whole are wholly disinterested parties; although some of them are members of the church that is grantee in one of the deeds; while others are, of a different religious faith. It is a significant fact that this testimony comes from those who were intimately acquainted with the grantor, and were in a position to observe him during a long period of time; while a large amount of the testimony in behalf of appellees comes from people who were comparative strangers to Coughlin, and knew him during the time he resided in Clinton with appellee Mrs. Gesland, after the deeds in controversy had been executed.

The evidence is exceedingly close upon the fact question as to whether or not there was mental capacity on the part of the grantor to execute the deeds in question. Mere old age and a certain degree of physical and mental impairment incident thereto are not sufficient, in the law, to deprive one of the capacity to convey property by deed or will. We have frequently recognized this rule under a variety of circumstances. One of the strongest incentives to the accumulation of property is the right to dispose of the same as a person may see fit, under the law of his domicile. While courts should be, and are, zealous to see that the weak and frail are not overreached or taken advantage of, they must be equally zealous to guard the right of every man to dispose of his own property as he sees fit, provided he has sufficient mental capacity to know what prop-

erty he possesses, and what he desires to do with it, and exercises his free and voluntary will in the disposition of it. It is inevitable that, as a general rule, physical weakness is incident to the approach of old age; and there is, of necessity, a degree of deterioration of the mental faculties. The step becomes slow and halting, and the eyes lose their luster, with the onward course of time. Forgetfulness almost inevitably and necessarily comes, as one approaches the shadows of life. The symptoms are familiar and well known. These and other evidences of old age may advance to such a degree that senility results. The mind may be broken and helpless, and the person the easy prey of the designing and vicious, and the party may be incompetent to transact business affairs with conscious appreciation of their extent or attendant results. But a disposition of one's property is not to be set aside on the ground of mental incapacity unless the evidence is of such a character as to convince and satisfy a court of equity that the grantor was so lacking in mental ability that he could not reasonably exercise judgment and discretion in regard to the particular business in hand. The shrewdness and alertness of strenuous business competition are not required. Men in good mental condition err in judgment in business transactions, and it is not unknown that financial disasters frequently result. Business transactions are often ill-advised; and no hard and fast rule can be laid down by which to measure the exercise of judgment and discretion by one in disposing of his property. We are convinced from the record in this case that the grantor was eccentric and peculiar. He did erratic things through his life; but the greater weight of the testimony convinces us that he was a shrewd and careful man in a business transaction. He was zealous in guarding his own rights, and perhaps too exacting in demanding that to which he was entitled. He had reached a time in life and was in a physical condition in which he knew he could not live very long. He had such an amount of property that the income from it would amply provide for him as long as he might live. He was under no obligation to appellees. They were his nearest kin by ties of blood, it is true; but his acquaintance with them was not intimate, and his association with them had placed him under no particular reason

aside from that of kinship, that would require him to make them the objects of his bounty. The evidence shows that at one time he had visited the niece appellee, and that, shortly after his arrival there, she had asked him how long he was going to stay, and at the suggestion he became angered, and left the next day, and, so far as the record shows, never returned until in April, 1922, after the deeds were executed. There is evidence that he told a neighbor, in effect, that the Geslands were too proud for him. As to the other appellee, the grantor had never met him except about three times, at the funeral of some relative.

Every case of this kind must rest upon its own peculiar facts. The testimony of Coughlin himself, at the examination for the appointment of a guardian, in the fall of 1922, some months after he had made the deeds, and under the circumstances disclosed, is, we think, not so conclusive as to be determinative of the mental condition of Coughlin at the time of the execution of the deeds in question. Nor do we regard it, in connection with all of the other evidence in behalf of appellees, as sufficient to satisfy us that the grantor was so lacking in mental capacity to execute the instruments in question as that they must be vacated, set aside, and held to be null and void. As before stated, the case is not free from doubt. We recognize the rule that, where the relation of parishioner and priest exists between a grantor and a grantee, the burden of proof rests upon the grantee to show the *bona fides* of the transaction. Recognizing this rule, however, upon the entire record in the case we are of the opinion that the grantee, Baxter, sufficiently carried said burden, under all of the facts and circumstances as disclosed by the record. While the case is close on the fact question of mental competency,—more so than on the question of undue influence,—we are of the opinion that, at the time of the execution of the conveyances, the grantor was possessed of such mental capacity as enabled him, in law, to execute the deeds in question. He did not strip himself of his property, but, on the contrary, expressly reserved in the deeds a life estate which was ample to support him as long as he should live. He conveyed a portion of the property to the people with whom he lived, and upon whom he was dependent for care, and who were ministering to him in a way that was gratifying

and satisfactory to him. He was under no obligation except the somewhat remote ties of kinship to appellees. He had never had wife or child. He disposed of his property in such a way as would benefit the church he loved, and be of service and ministration to those who were in need. We cannot say, under the record, that he did not have the mental capacity to intelligently make this disposition of his property in the manner in which it was made. The trial court should have entered a decree dismissing appellees' petition, and by its terms reforming the deed to appellant Baxter, as prayed by him. A decree may be entered in the trial court to that effect, or in this court, as appellants shall elect.

The result is that the decree appealed from must be, and it is,—*Reversed.*

EVANS, STEVENS, ARTHUR, and VERMILION, JJ., concur.