MAGGIE BRUEY CRAWFORD et al., Appellants, v. FRED M. RAIBLE, Administrator, et al., Appellees (and two other cases).

OCTOBER 16, 1928.

X. C. Nady and Roberts & Roberts, for appellants.

Roscoe P. Thoma, for appellees.

DE GRAFF, J.—Three salient dates are found in the chronology of the actions at bar, to wit: (1) December 4, 1925, when Louis Bruey learned that his younger daughter Edna was pregnant by a young man named Sam McNeese, and on the following morning, shot and killed McNeese in the Bruey home; (2) December 12, 1925, when Bruey executed and delivered certain deeds conveying his undivided one-fourth interest in his deceased father's farm to Sylva Raible, Bruey's sister, and his own farm of 183 acres to Fred M. and Sylva Raible, also a bill of sale to Fred M. Raible, transferring title to all the live stock on said farm; and (3) February 27, 1926, two days prior to the date set for the trial of Bruey for murder, when Bruey committed suicide by hanging.

The three issues presented by the pleadings focus around the instruments in writing executed by Bruey, as aforesaid, and involve (1) the sanity of Bruey; (2) fraud and undue influence exercised upon Bruey in procuring said instruments; and (3) the failure of consideration to support said instruments. These correlated questions make necessary a statement of the subject-matter of the three actions consolidated for the purpose of trial and the primary facts upon which the defined issues are predicated.

The first case, entitled Maggie Bruey Crawford et al. v. Fred M. Raible, Administrator, et al., is an action in partition, involving the undivided interests of the heirs of Peter Bruey, Sr., father of Louis Bruey, in the farm of Peter Bruey, Sr.

This action was commenced prior to the suicide of Bruey, and a decree in partition had been granted, the land ordered sold, a referee appointed, and the interest of Louis Bruey was held by the referee, subject to decision on appeal. The Crawford case, supra, has little, if anything, to do with the issues involved in the two subsequently filed causes.

The second cause of action, entitled Marshall Stever, administrator, v. Fred M. Raible, involved the cancellation of the bill of sale of the live stock by Louis Bruey to Raible, on the ground of fraud and undue influence. The trial court dismissed this petition.

The third cause, entitled Beulah Bruey Tonkinson *et al.* v. Fred M. Raible *et al.*, involved the deeds in question, and in the petition it is alleged that there was lacking a sufficient and adequate consideration, and that, at the time of the execution and delivery of said deeds, Louis Bruey was mentally incompetent, and his will was overpowered by fraud and undue influence. The trial court dismissed this petition, for want of evidence to sustain the allegations of the complainants.

What are the facts? Louis Bruey was a widower. His wife died in December, 1924, and after her death he continued to live in his farm home in Cedar Township, Jefferson County, with his two daughters and only children: Beulah, who was 17 years old May 25, 1925, and Edna, who was 14 years old on August 6, 1925. On December 4, 1925, having learned from some source that his daughter Edna was pregnant, Bruey confronted the girls with this information. They admitted the fact, and told the father that Sam McNeese, a 19-year-old neighbor boy, had come to the Bruey home in the month of August previously, while Bruey was absent from home, broken into the home, and forcibly assaulted Edna. This story was untrue, but the father had no reason to disbelieve his daughters. As a matter of fact, the two girls and the McNeese boy had agreed among themselves that, in the event that the father should learn of Edna's condition and confront her with that fact, he should be told what the father was told by the girls. The Bruey girls had never kept company with boys to their father's knowledge, and he always expressed and evidenced a parent's solicitude for the welfare of his daughters. After the mother's death, the father instructed the girls that, when he was absent from

the house,—dragging the roads, or in town on business,—they should keep the doors locked. The girls respected this injunction, with the exception of the McNeese boy.

The record discloses that, prior to the August visit by McNeese, Edna had been keeping company with him, and had, in fact, been having frequent sexual intercourse with him for about 15 months. The truth of the situation was never divulged by the girls to their father. He did learn the truth from other sources after he shot and killed young McNeese, and then expressed remorse for his act. It is apparent that the girls intentionally and designedly deceived their father. It is so admitted in their testimony.

On the morning following the telling of the false story by the girls, Bruey telephoned the McNeese home, and requested that Sam be told to come to the Bruey farm. He came, and was confronted with the story as told by the girls to the father. Sam admitted the facts as recited, whereupon Louis Bruey shot and killed him. Beulah was present at the time of the tragedy, but did not attempt to stop her father, nor did she tell him "a single word" of the true situation. She testified:

"As far as I know, father went to his grave believing the story that I had told him on the evening of December 4th as to the relations between Sam and Edna."

Bruey, immediately after the shooting, called his neighbor Cornell by phone, and, upon the arrival of Cornell, told him the facts. Another neighbor was called, and was told of the situation, and then Bruey called the sheriff of Jefferson County, and told him to come out. The sheriff, with his deputy, respected the request, and Bruey was arrested, and, upon preliminary hearing, was bound over to the grand jury for the crime of murder in the first degree.

On the afternoon of December 11, 1925, Leo D. Thoma, an attorney of Fairfield, Iowa, received a telephone call from the sheriff, and was told that Louis Bruey wanted to see him and Fred Raible. In response to this message, Raible and Thoma went to the county jail, were admitted, and taken into the presence of Bruey. Thoma had appeared for Bruey at the preliminary hearing. Raible was the husband of Bruey's sister Sylva. Bruey began the conversation with Raible, and was

told that Thoma had previously said to him (Bruey) that the anticipated cost of making a defense in the criminal case would probably be somewhere from $4,000 to $7,500. Bruey also said to Raible at this time:

"I have never paid you that note I gave Sylva back in 1914, and I have never paid you folks that $1.00 a day for Peter's care [a crippled and helpless brother of Bruey's, for whom he had made himself responsible] since that note was given, and up until the time of Peter's death. I don't know how I could raise the money to pay you folks what I owe you on Peter's care, and raise the money to make my defense in this case. I don't suppose any bank would want to loan me money, with me being held here in jail without any bond. Will you and Sylva be willing to let me deed my interest in the old home place to Sylva, and deed to you and Sylva my farm where I live, and give you my live stock down on the place? Would you folks be willing to take that as payment for what I owe you for Peter's care, and you undertake to finance my defense in this action? Do you suppose Sylva would be willing to do that?"

To this Fred Raible replied:

"Louie, you know that Sylva always thinks whatever you want to do is all right, and I know, if you want to do it that way, it will be all right with Sylva. Now, Louie, if that is what you really want, and you want to do it that way, I am perfectly willing to go ahead and do everything I can for you."

Thereupon, Bruey turned to Thoma, and said:

"Leo, would you be willing to look to Fred for pay for your services in this criminal case?"

Thoma replied:

"Louie, if Fred Raible tells me he will pay for my services in this case, he will do it, and I will certainly be willing to do it."

Bruey then said:

"You go ahead and draw up my deed to my interest in the old farm, conveying that to Sylva. Then there is a mortgage of $3,000 on my place. It was originally about $5,000, but

it has been paid down to $3,000. Mr. Trial holds it. You make out the deed for me to execute, conveying that farm to Sylva and Fred, subject to the $3,000 mortgage on my place, and provide that they assume and agree to pay that mortgage. How do I transfer that live stock down on the farm to Fred?

To this question Thoma replied: "The best way is simply to execute a bill of sale." Bruey then said: "Draw up a bill of sale for that." Thoma asked what the personal property was, and Bruey gave him a description of it. Bruey then said:

"There is another thing,—I have never paid those funeral expenses for Peter's funeral, and I owe several little outstanding accounts. I have got some money over in the savings bank that is enough to pay those funeral expenses and those accounts,"—and then asked Fred if he would take that money in the bank and pay the funeral expenses of his brother Peter, and also pay the other outstanding accounts which he then and there told Raible existed, and Raible made a memorandum of them. Bruey then took his check book, and wrote out a check on the Iowa Savings Bank, payable to Raible, and handed it to Raible. Bruey also at that time asked Raible if there was anybody staying in the house on the farm, to which Raible said: "No." Bruey then said:

"All my papers and receipts and things of that kind are down there, and I wish you would go down there and get those papers and bring them up here, or put them in your safe and take care of them."

When Bruey told Thoma to draw the deeds, Thoma said:

"Now, Louie, these deeds will have to have revenue stamps on them, which must be fixed on the basis of 50 cents for each $500 or fraction thereof. What amount of revenue do you want to put on these deeds?"

Bruey said that he did not believe the old home place would bring $40 per acre, and said that his home place had been bought by him for $14,000 in 1912, and that he did not suppose the farm could be sold under present conditions, for what he paid for it in 1912, although the farm was really worth more money than that. He finally told Thoma to convey it subject

to $3,000, and that the amount of revenue stamps should be on a basis of $12,000. He gave Thoma a description of the live stock, and said that the live stock was worth around $1,400 or $1,500.

On the next morning (December 12th), Thoma drew a deed conveying from Louis Bruey to Sylva Raible his one-fourth interest (admitted in value to be $1,500) in the old Peter Bruey farm, and also drew a deed conveying to Fred M. Raible and Sylva Raible the Bruey farm of 183 acres, affixing the revenue stamps, and also drew a bill of sale from Louis Bruey to Fred M. Raible and wife, Sylva, for the live stock. Upon notification, Raible went to Thoma's office, and requested that Thoma go with him to the jail, for the purpose of having Bruey sign and acknowledge the written instruments. Thoma was engaged in his professional work at the time, and suggested to Raible that he get another notary to take the acknowledgment, and also gave instructions as to the cancellation of the revenue stamps on the written instruments. Raible did secure another notary, J. W. Cassell, who took the written documents to Bruey at the jail. Bruey read them over, and signed and acknowledged them.

These written instruments were delivered to the grantees on December 12, 1925, and thereupon Raible and his wife borrowed from the Iowa State Savings Bank of Fairfield $10,000, secured by a mortgage on the 183 acres, for the purpose of paying off the existing $3,000 mortgage and $150 interest, and also to raise sufficient money to carry out their promise and fulfill their obligation to meet the anticipated expenses incident to the trial of Louis Bruey on the charge of murder.

Pursuant to the agreement between Bruey and Raible, the latter did pay the $3,000 mortgage, with accrued interest, and did pay Leo D. Thoma $2,307.70 for services and expenses, and obligated himself to pay Thoma an additional sum of $100 per day during the trial of Bruey. He also retained Attorney Jaques, of Ottumwa, in the same cause, paid him a retainer of $1,000, and obligated himself to pay Jaques an additional sum of $100 per day during the trial of the murder charge.

It also appears that the older daughter, Beulah, desired to marry, and, with the consent of her father, was married. Raible arranged for the couple to live on this farm and care for it, for a consideration of $40 a month and their living ex-

·penses. Mrs. Raible took charge of Edna, then pregnant, arranged for her to go to the hospital, bought her necessary equipment, and took her to the hospital, where the baby was born, in March, 1926. Mrs. Raible continued to care for Edna until May, when she went to the farm to stay with her older sister. The incidental expenses, including doctor and hospital bills, were paid by the Raibles.

After the indictment was returned against Bruey on a charge of murder in the first degree, it was understood and agreed that the Bruey case should be the first jury case tried, beginning Monday, March 1, 1926. On the preceding Saturday night, February 27th, Bruey committed suicide in his cell at the jail.

A preliminary proposition presented by appellants in briefs and arguments should first find disposition. This point has to do with certain rulings of the court on objections to evidence of Leo D. Thoma, a witness for appellees upon the trial. Thoma, as a witness, was permitted, over objection, to testify to the conversation between Bruey and Fred Raible at the jail, and as to the directions given him by Bruey at said time and place. It will be remembered that Raible and Thoma were present at the jail by reason of the express request of Bruey, and that this conversation involved the consideration for the conveyances in question and the directions given by Bruey to Thoma in the preparation of these written documents. The specific complaint of appellants is that the challenged testimony is within the prohibition of Section 11263, Code of 1924, which, in substance, provides that no practicing attorney shall be allowed, in giving testimony, to disclose any confidential communication properly intrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline.

We deem it unnecessary to enter into an elaborate discussion of the point involved. This court has so frequently ruled the proposition that it would be mere repetition to review the decisions that interpret, under particular facts, the provision of the statute to which reference has just been made. It is sufficient to state that the testimony of an attorney as to a transaction in which two parties consult him, for their mutual·

740

benefit, is not privileged in an action between such parties or their representatives, involving such transaction. *Mueller v. Batcheler*, 131 Iowa 650; *Stewart v. Todd*, 190 Iowa 283. The mere relation of attorney and client is not sufficient to invoke the inhibition of the statute. *Stoddard v. Kendall*, 140 Iowa 688. It is only communications which are confidential that are protected. *Caldwell v. Meltveldt*, 93 Iowa 730; *Mitchell v. Mutch*, 180 Iowa 1281. Communications made in the presence of others do not constitute a privileged communication. *Shaffer v. Mink*, 60 Iowa 754; *State v. Swafford*, 98 Iowa 362. Nor do directions given by a person to an attorney acting as a scrivener in the preparation of instruments come within the purview of the statute governing privileged communications. *Mueller v. Batcheler*, supra.

It is apparent from the record that there was nothing of a confidential nature in the conversations between Bruey, Raible, and Thoma. A confidential communication must necessarily be a secret one, and secrecy is enjoined, either actually or by implication. Such a communication is inherently private, and it is not intended or contemplated that it shall become known by others. In the instant case, there is no suggestion that the information and directions given were of a confidential nature, within the meaning of Section 11263. See *Moyers v. Fogarty*, 140 Iowa 701; *Wyland v. Griffith*, 96 Iowa 24; *Shaffer v. Mink*, supra. We hold that the testimony in question was proper to be considered.

We now turn to the issues, and will first consider the pleaded defense of lack of consideration for the execution and delivery of the instruments in writing by Bruey on December 12, 1925. It is contended that there was no adequate consideration for the transfer of the property by Bruey. The evidence is overwhelmingly to the contrary. The facts conclusively establish that the Raibles paid consideration to Bruey for the conveyances in question, as follows: Assumption of the mortgage of $3,000 and accrued interest of $150; the settlement of an indebtedness evidenced by a note for $2,920, with 6 per cent interest, dated September 10, 1914, payable to Mrs. Raible, and signed by Bruey, which note, with interest, at the time the deeds were executed, amounted to $4,890; and also the settlement of an indebtedness of $4,038 due from Bruey to Sylva Raible for the

care of the crippled brother, Peter, at the rate of $1.00 per day for 11 years and 23 days, independent of the note indebtedness, under an agreement between Bruey and his sister Sylva, which arrangement was expressly ·approved and confirmed by the district court of Jefferson County, Iowa; and the agreement by Raible to arrange for the defense of Bruey on the charge of murder, including the employment of counsel, payment of all fees, costs, and expenses, which it was estimated would be from $4,000 to $7,500.

This consideration in the aggregate, including the estimated cost of defense, amounted to $19,578. The good faith of the Raibles is evidenced by what they did in paying off the mortgage, in employing and paying counsel for what had been done, and in obligating themselves to pay counsel in the. defense of Bruey, and also expenses and costs in addition thereto. It is further evidenced by their offer in open court to reconvey title, upon payment to them of the amounts expended by them in the fulfillment of their agreement with Bruey.

We now ask, what was the value of the property received by the Raibles? The Louis Bruey one-fourth interest involved in the partition suit of the Peter Bruey, Sr., farm is admitted to be $1,500 in value. The value of the Louis Bruey farm of 183 acres was determined by the trial court to be $14,600, and a critical study of the record confirms the valuation established by the trial court. The value of the live stock covered by the bill of sale is $1,657.80, and there is no serious dispute concerning this item. The aggregate value of the property conveyed is $17,757.80. It may be observed that the questioned instruments recited consideration in hand paid. See *Lavelle v. Lavelle*, 164 Iowa 99. Furthermore, mere inadequacy of consideration, even if the same existed, would constitute no ground for setting aside the conveyances. *Parsons v. Crocker*, 128 Iowa 641; *Collar v. Ford*, 45 Iowa 331. In the light of the record and the applicable legal principles, the plea of want of consideration must fail.

What evidence is there of fraud and undue influence? Under the circumstances, we cannot presume fraud in the conveyance of the properties from the inadequacy of consideration, as alleged, since the evidence demonstrates that there was full consideration paid. It is a well established rule that equity will not relieve

from a sale, even at a serious reduction in value, when the sale or conveyance is made without fraud or deception. *Tansil v. McCumber*, 201 Iowa 20.

The instant record is barren as to fraud, duress, and undue influence. There existed no fiduciary relation between the parties, and the presumption obtains in favor of the bona-fide character of the transaction. *Latta v. Coffeen*, 140 Iowa 515; *Detrick v. Patterson*, 159 Iowa 460. The instant facts are consistent with the implications and inferences of honesty and good faith on the part of the Raibles. See *Herwehe v. Schultz*, 191 Iowa 1280. The evidence does not disclose that the Raibles ever mentioned to Bruey that a conveyance of his properties should be made to them for any purpose. Bruey himself took the initiative, and it was on his motion, after careful deliberation on the situation in which he was placed by reason of his act, that the conveyances were made. The Raibles simply acceded to Bruey's own plan and wish. Bruey fixed the entire terms and conditions of the agreement and consummated transaction. No witness was offered by the appellant who claimed or testified to any misrepresentation, deceit, or undue influence on the part of the Raibles or anyone acting for them. It is obvious that the trial court correctly ruled this plea.

Was Bruey insane? We think not. To justify a court in setting aside a conveyance on the ground of mental incompe-tency, the evidence must be clear, satisfactory, and convincing. In the case at bar, the usual indicia of mental incompetency are not present. Age, delusions, physical ailments, loss of memory, and eccentricities are not under consideration. The courts zealously guard the right of every person to dispose of his property as he sees fit, so long as he has the mental capacity to know what property he possesses and what he desires to do with it. *Coughlin v. St. Patrick's Church*, 201 Iowa 1268. See, also, *Overmyer v. Overmyer*, 191 Iowa 1011; *Sutherland State Bank v. Furgason*, 192 Iowa 1295.

The burden as to the plea of insanity was on the appellants. What evidence tends to sustain that burden? Two expert witnesses for the appellants answered favorably to the appellants' hypothetical question, but this question failed to include the fact of the relations between Edna and the McNeese boy for

more than a year prior to December 4, 1925; that the story told Bruey on that evening by his daughters was a lie; that neither of the girls ever told their father the real truth; that, after Bruey did learn the truth, he said that he would not have shot McNeese. The hypothetical question did not state any of the facts in connection with the conversations and negotiations between Bruey and Raible and the agreement reached on December 10, 1925, or state the consideration paid by the Raibles and the undertakings assumed and promised by them. We deem the answer of the two experts to be of little or any value in the determination of the issue in question. In fact, the medical experts on cross-examination nullify their first answer, since they recognize that a person of normal mind, under the stress of circumstances such as confronted Bruey, might have acted as he did, for the reason that scarcely any two people would have the same reaction under a similar situation.

With respect to the conveyances, appellants' expert witness Dr. Stewart testified, upon cross-examination, "that a man committed to jail, and knowing that he was to be met with a murder charge, had to be confined some time, owed a considerable sum of money which he had obligated himself to pay, and had nothing with which to pay such indebtedness except his real estate and personal property, to convey such property to discharge such indebtedness would not be any evidence of unsoundness of mind." It is recognized by both of appellants' experts that "experts recognize what is called irresistible impulse," and that, when one feels that he has been greatly wronged, he becomes very much excited, and in anger might be seized with an irresistible impulse to injure the party he believes to be responsible.

"If he doesn't control that impulse, it shows some weakness, but that alone is not exactly insanity. As a matter of fact, that is inability to control their passions. In the case we are talking about, it is probably only momentary. If these girls, instead of having told their father what they did, had told him the truth, I would expect the reaction on the father to be different. The chances would be against his feeling his anger toward the boy as much as it would the other way."

Had the facts appearing in this record and omitted from

the hypothetical question been included in the question, it is apparent that the doctors in the first instance would have answered differently. However, the appellees submitted a witness who was an expert alienist and well known psychiatrist, Dr. Charles Ricksher, who answered the hypothetical question in these words:

"I see nothing in that that would make me think he was insane. In my judgment, he was a sane man."

Furthermore, the record discloses the testimony of two reputable physicians who had made a physical and mental examination of Louis Bruey on February 3, 1926, and apparently in anticipation of the trial of Bruey on the murder charge. They saw nothing that would lead them to think that Bruey was insane. The appellees also called lay witnesses, who testified to their observations of Bruey, and expressed their opinion that he had been and was a person of sound mind.

The appellants urge some matters as indicating Bruey's unsoundness in mind. One fact is that his brother Peter Bruey was mentally unsound. The evidence shows that Peter was afflicted with scarlet fever, when but a few days old, and that this disease left him in a pitiable physical and mental condition. He lived to be 48 years old, and it is true that he required assistance from the other members of the family. If we give the fact of Peter's incapacity all the weight to which it is entitled, it does not, in any sense, tend to establish the mental unsoundness of Louis Bruey.

It is also urged by appellants that Louis Bruey, after the death of his wife, would sit with his face in his hands. He did this by reason of the great grief which he, as a husband and father, experienced. It was a normal thing for any individual to do, especially a man of the temperament and caliber of Louis Bruey, whose heart was full of love and affection for his wife who had passed on.

It is also claimed that Louis Bruey beat some of the animals on his farm. If we accept Beulah's statement that he did knock a cow down with a pole, it is explained, upon her cross-examination, that this cow kicked when her father milked her, and he tried to "break her of the kicking habit." With respect to the horse to which Beulah referred on her direct ex-

amination, she testified, on cross-examination, that the horse had a habit of kicking in the stalls, and the father tried to break the horse of that habit,—"that is the way I understood it."

There is some evidence which, if believed, discloses that Louis Bruey was temperamental, and was not slow to anger. On the other hand, he was a man of exemplary habits. He did not drink, swear, chew, or smoke. There is one fact, however, to which Beulah Bruey Tonkinson testified which, in the light of all the testimony, is unbelievable. The trial judge did not believe it, and in his filed opinion in no uncertain language said so. Before this fact is stated, it may be remarked that Beulah never, after the killing of McNeese, made it known, although she was questioned in preparation for the murder trial, and had been urged to relate anything strange or unusual in relation to her father's acts and conduct. She had never mentioned this thing to the Raibles, and had never mentioned such a thing to Bill Tonkinson, whom she married, until within two months prior to the beginning of this trial. Upon the trial, Beulah testified that her father lasciviously chased her, and that he practiced masturbation,—a word which she did not know until Tonkinson came home from a lawyer's office with this word on his lips. The credibility of testimony in any case is subject to three tests: Is it natural? Is it reasonable? Is it corroborated? The fact testified to by Beulah fails to meet these tests. When we consider the type and character of Bruey, her testimony in this particular is unbelievable. Bruey was a kind and loving father. He carefully watched over these girls. He gave them proper advice and admonition. He was a man without any bad habits. Even the experts frankly state that it would not be at all probable that it would happen. We do not believe it did happen.

In conclusion, we hold, as did the trial court, that the appellants have wholly failed to show by clear, satisfactory, and convincing evidence that Louis Bruey, on December 12, 1925, was of unsound mind. The decrees entered by the trial court are sustained in all particulars, and are—*Affirmed.*

ALBERT, MORLING, and WAGNER, JJ., concur.

STEVENS, C. J., concurs in the result.