W. H. KEATING, Guardian, et al., Appellants, v. J. D. AUGUSTINE, Appellee.

No. 41204.

MARCH 8, 1932.

W. H. Keating and C. H. E. Boardman, for appellants.

McCoy & McCoy, for appellee.

GRIMM, J.—Mary J. Spates, who will hereafter, for brevity, be designated as the "grantor," and who died in Mahaska County, Iowa, sometime in midsummer of 1931, had lived in that county for many years. It appears that she was divorced in 1927. She was a soldier's widow and received a pension.

The storm center of this litigation is a transaction which took place on the 25th day of January, 1929, when the grantor executed a deed for eighty acres of her land in favor of the defendant, J. D. Augustine, her nephew. At that time, she was the owner of 240 acres of land in Mahaska County. 160 acres of this land was in a square quarter section. The 80 acres in controversy lay north of the quarter section. That is to say, the west 40 of the 80 acres in controversy adjoined the quarter section on the north and the east 40 of the 80 acres cornered onto the northeast corner of the quarter section.

During all the time material to this controversy, the grantor lived in town, and her land was rented and operated by the defendant and his father.

It appears that in addition to the 240 acres of land, the grantor had accumulated about $22,000.00 in moneys and credits, much of which was loaned to residents of Oskaloosa and the surrounding territory.

After her divorce, the grantor lived alone. She had four brothers and one sister. She had about twelve nieces and nephews. She testified that her father was induced to make a will in which her brothers received the property, and in retaliation therefor, she determined to pass all her property to her nieces and nephews.

Prior to the date of the deed in controversy, the grantor

had made a will, in substance, distributing all of her property in equal shares to all of her nieces and nephews, of which the defendant is one. Prior to the date of the deed, the grantor had sent word, at various times, by some relatives, that she wished to see "John," the defendant, at her home. He finally responded to the call, and the result of the conference was that the defendant was directed to bring one David S. David, an Oskaloosa attorney, to the home of the grantor for the purpose of enabling the grantor to execute and deliver a deed to the 80 acres of land hereinbefore referred to, to John D. Augustine, the defendant. Mr. David and the defendant appeared at the grantor's home, and the deed was executed and delivered to Mr. David for the defendant, to be recorded by Mr. David when he learned of the grantor's death. Subsequently, some of the other nieces and nephews received information that this deed had been executed, whereupon a guardian was promptly appointed for the grantor, based upon the allegation that "she, the grantor, is now past 80 years of age, and because of this fact and her other physical infirmities, she desires that the court appoint W. H. Keating as her guardian to look after her property, real and personal, and transact all her business of every kind and nature."

Thereafter, the guardian made demand for the deed and it was refused, whereupon this action was brought. A trial was had, and the lower court dismissed the plaintiff's petition.

I. One of the principal contentions on behalf of the appellant is that there was never a sufficient delivery of the deed, therefore it never became effective. The question whether there has been a sufficient delivery of a deed has been before this court many times. The principles have been so often discussed and announced that we deem it wholly unnecessary to review our cases at this time. It is sufficient, for the purposes of this case, to quote very briefly from a few of our later cases on the subject.

In Matheson v. Matheson, 139 Iowa 511, l. c. 514, this court said:

"It is an elementary proposition in the law of deeds that the delivery to a third person for the grantee without any reservation by the grantor of a right to recall it is sufficient in law, and effects a complete transfer of the title to the property which

is the subject of the conveyance. * * * Where a deed or instrument purporting to convey valuable property and creating no obligation or burden to be assumed by the grantee is delivered to the manual possession of the grantee himself or to some third person for such grantee's benefit, his acceptance is presumed until the contrary is shown.''

In Kyle v. Kyle, 175 Iowa 734, 737, this court said:

''That delivery is essential to the effectiveness of a deed to real estate is elementary, but just what amounts to a delivery is sometimes a question of doubt. Ordinarily, it is the simple transfer of possession of the written instrument from the grantor to the grantee with intent on part of the grantor to convey and on part of the grantee to acquire title to the property described therein. But an actual manual transfer of the paper is not necessary. A delivery may be effected by acts without words, or by words without acts, or by both words and acts. Assuming the instrument to have been properly executed ready for delivery, acts and words evincing intent to part with it and relinquish the grantor's right over it is a sufficient delivery. Whiting v. Hoagland, 127 Wis. 135; Woodward v. Woodward, 8 Halstead's Ch. (N. J.) 779, 784. It may be made direct to the grantee or to a third person in his behalf. Owen v. Perry, 25 Iowa 412; Clarity v. Sheridan, 91 Iowa 304; Adams v. Ryan, 61 Iowa 733; Matheson v. Matheson, 139 Iowa 511, 514. In final analysis, it may be said that delivery is a matter of intent, and any distinct act or word by the grantor with intent to pass the title to the grantee by transferring the deed to him or to another for his benefit is a delivery. Collins v. Smith, 144 Iowa 200, 203; Kneeland v. Cowperthwaite, 138 Iowa 193, 194; Schurz v. Schurz, 153 Iowa 187, 190; Criswell v. Criswell, 138 Iowa 607, 609. It is also well settled in this and other states that a deed duly executed and deposited with a third person with directions to deliver it to the grantee upon the death of the grantor is an effective conveyance; that such a deed vests the grantee with the title, but his right to possession and enjoyment is postponed until the grantor's death. In such case, the delivery which the law requires to make a deed legally effective is complete when the deed is placed in the hands of the depositary; but it does not become effective for the purposes of pos-

session and enjoyment of the property until the time comes for the secondary delivery by the person to whose keeping it has been entrusted.''

In Goodman v. Andrews, 203 Iowa 979, 1. c. 981, this court said:

''The intent of the grantor is of controlling importance in the question of delivery of a deed; and it is well settled that, where a deed duly executed by the grantor is deposited by him in the hands of a third person, with direction to deliver it to the grantee, or to place it of record on the death of the grantor, and there is no reservation of a right to recall it, there is a sufficient delivery. Hinson v. Bailey, 73 Iowa 544; Trask v. Trask, 90 Iowa 318; White v. Watts, 118 Iowa 549; Dettmer v. Behrens, 106 Iowa 585; Everts v. Everts, 120 Iowa 40; Albrecht v. Albrecht, 121 Iowa 521; Foreman v. Archer, 130 Iowa 49; Criswell v. Criswell, 138 Iowa 607; In re Estate of Bell, 150 Iowa 725; Kyle v. Kyle, 175 Iowa 734; Bradley v. Bradley, 185 Iowa 1272; Lathrop v. Knoop, 202 Iowa 621.''

In Davis v. John E. Brown College, 208 Iowa 480, many of our cases on this subject are collected and commented upon.

Measured by the foregoing yardsticks, we are to determine whether there was in this case an execution and delivery of the deed. It satisfactorily appears in the record that sometime prior to the 25th day of January, 1929, the grantor sent word by at least two of the relatives that she wished to see ''John,'' the defendant, at her home. This is undenied. The first of these messages was approximately a week before the day the instrument was executed. The defendant finally called at the home of the grantor on the afternoon of January 25, 1929. The grantor, before and after. the execution of the deed, had explained at various times to various parties that the defendant was her favorite nephew; that he had been very kind to her. He had not only granted many favors to her in the matter of assisting her in managing her farm property, but he had been kind to her in and about the home and in the matter of taking her from place to place, at times, and in many other ways. She at times called him ''her boy.''

During the course of the conversation between the grantor and the defendant, on the afternoon above referred to, the

grantor recited many of these facts to the defendant and told him she wished to convey 80 acres of land to him. She suggested that Mr. David be brought to the house for the purpose of making the deed and closing the transaction.

Without going too much into detail, we may say that with the information thus obtained from the grantor, the defendant called on Mr. David and a deed was prepared. There was also prepared an envelope in which the deed was to be kept, and sometime in the evening of the date of the deed, the defendant and Mr. David appeared at the grantor's home. There the grantor recited to Mr. David her fondness for "John," and the reasons therefor, and also her desire to give him 80 acres of her land. While this conversation was going on, the grantor requested the defendant to fix the furnace fire in the basement, which he did. Further conversation ensued between Mr. David and the grantor, while the defendant was fixing the fire. After his return to the room, the grantor executed the deed, which Mr. David had previously prepared and brought with him, and also signed an endorsement on the envelope in which the deed was to be kept. The deed thus signed and acknowledged, and the endorsement on the envelope thus signed, were both turned over to Mr. David. At the grantor's request, the defendant paid the grantor $1.00. She explained she desired the $1.00 to be paid, by saying:

"They (the relatives) may cause you some trouble over this, you want it fixed up right. Pay it to me in his (Mr. David's) presence."

She then said to Mr. David:

"This is John's deed. You keep it until my death and record it for John."

The envelope in which the deed was enclosed and which had been prepared by Mr. David contained the following endorsement:

"The enclosed deed is left by me with David S. David of Oskaloosa, Iowa, and I hereby direct and authorize the said David S. David to record the within enclosed deed on the date of my death and I hereby authorize and appoint him to do so." (Signed) Mary J. Spates.

At the time of this interview, the grantor advised Mr. David that she had made a will, giving her property to her nieces and nephews, to be divided equally among them, share and share alike, but she expressed the desire, because of what the defendant had done for her, that the defendant should have more than this equal distribution. The grantor, previous to signing the instrument, read it carefully, and she also read the endorsement on the envelope. She expressed the desire at that time that the matter of the conveyance be kept quiet. She fully appreciated that if the other nieces and nephews learned of the deed, they would immediately make trouble for her. Mr. David placed the deed in the envelope, sealed it, and the defendant and Mr. David left the home.

About six months thereafter, the grantor called at the office of Mr. David and inquired if he still had the deed. Being advised in the affirmative, she said: "You know I told you to keep it for John Augustine and record it at my death."

More than a year after this deed was executed, the grantor made a new will, the principal change being a change in the name of the executor. The defendant remained one of the beneficiaries, without change. Sometime in August, 1930, more than a year and a half after the execution and delivery of the deed, one of the nieces learned of the transfer of the 80 acres, and forthwith a "council of war" was called. All the nephews and nieces who could be reached and some other interested parties were immediately gathered together. The grantor was promptly taken to the home of this niece, who for many years had been a stenographer in the law office of Attorney W. H. Keating, the guardian. In the midst of this upheaval, the grantor was induced to sign a petition for a guardian, which contains the following language:

"Comes now Mary J. Spates and states to the court that she is now past 80 years of age and because of this fact and her other physical infirmities she desires that the Court appoint W. H. Keating as her Guardian to look after her property, real and personal and to transact all her business of every kind and nature."

Keating was appointed guardian.

It is worthy of notice that in Mr. Keating's applications

for orders of various kinds, of which there were several, there is nowhere any allegation of the mental unsoundness of the ward. The allegations refer only to her age and natural infirmities. We will dwell further on this matter of her mental condition later.

After the guardian had been appointed, a demand was made by the guardian for the deed, but it was not delivered, and this suit followed. The grantor was a witness and testified at great length. We will not undertake to set out even the substance of her testimony, but will refer to only a few significant statements made by her at that time.

Referring to the evening when the deed was executed, she said:

"I don't remember whether my nephew talked any at that time. I knew I signed the paper or deed, I knew I was giving my nephew some additional land,—that was talked over between me and Mr. David and my nephew John that evening. We were going to keep it a secret, wasn't going to let it be known until after my death. The understanding I had with Mr. David and my nephew John that evening that the deed would be kept off the record and kept a secret until my death, and that is what we were going to do, when Josh (a relative) came and wanted $3500, and that scared me. I knew I signed the deed, and I knew the land it conveyed, and I knew the deed called for 80 acres; that is what I wanted to do. Q. But it was your intention, the night that Mr. David and John were there, to sign and execute a deed conveying to John Augustine, at the time of your death, eighty acres of land, wasn't it? A. Why, yes. I was going to make a division of it for all of them."

She further says:

"But what I want now, I want this property myself. I want you to understand that I wanted it deeded back to me. Then I would give it around to these children. Wasn't to get it for myself."

Nowhere is there any showing of either fraud or duress. The grantor frankly admits she knew what she was doing, and it clearly appears that she personally was not responsible for the proceedings, but that she was urged into it by the other

relatives, who demanded the return of the deed in order that they might secure a larger portion of the grantor's property. She herself complains of the manner in which she has been seized upon by her relatives in connection with this transaction. It clearly appears from the record that these relatives were constantly endeavoring to borrow money from her, and several of them did. These amounts varied from about $2400.00 to a few hundred dollars. Others were trying to get more loans from her, and when it became known that this deed had been made and delivered, most of them immediately began a stormy campaign for a return of the deed, not for the benefit of the grantor, but each for his own ultimate benefit. The grantor, at one time in her testimony, said: "They (the relatives) couldn't wait until after I died, they had to come in before." In another place, she says: "Why they all told me that they was waiting for me to die."·

Without further comment on the evidence upon this particular branch of the case, we find that the grantor executed the deed in question and delivered it to Mr. David without any reservations whatsoever. The transaction was completed, except that the deed was not to be placed on record until the time of grantor's death, but the grantor intended by what she did to place the deed beyond her power of recall and pass the title to the defendant.

The appellant claims that Mr. David was the attorney and agent of the grantor and, therefore, a delivery of the deed to him was not a delivery which passed the title. Renehan v. McAvoy, 116 Md. 356, 81 Atl. 586, 38 L. R. A. (N. S.) 941, is one of the cases relied upon. Close examination of that case shows it is clearly distinguishable from the case at bar. In that case, the depositary testified:

"I then asked him (grantor) what he wanted done with it (the deed) and he said that he wanted me to keep it for him (the grantor) ; at his death to have it put upon record."

Afterwards, the grantor called upon the depositary, secured the deed, and deposited it with another party. The court held that there had not been a delivery because the deed was within the control and subject to the authority of the grantor.

We are referred to 8 R. C. L., pages 991 and 992, paragraph

57. The text there found contains, among other things, the following:

"But where the deed is placed in the hands of a third person, as the agent, servant, friend, or bailee of the grantor, for safekeeping only, and not for delivery to the grantee, such transfer does not constitute a delivery, and the instrument fails for want of execution."

Manifestly, if the deed is deposited for safe-keeping only, and not for delivery to the grantee, then there is no delivery which passes title. All the cases cited by the appellant have been carefully examined and are distinguishable.

In the case at bar, it appears that David had transacted some business for the grantor, and it may be that the grantor and perhaps Mr. David and the defendant considered that Mr. David was acting for the grantor in preparing the deed; but on the whole record, it clearly appears that Mr. David was not holding the deed for the grantor, though he may have been holding the deed at the grantor's request. The deed had been signed, acknowledged, and delivered to Mr. David for the defendant, and Mr. David was not holding the instrument as the agent or employee of the grantor. She made no reservations whatever in the delivery of the deed to Mr. David. She fully intended to and did close the transaction when she gave the deed to Mr. David for the defendant. She understood then and understood at the time of the trial that she had deeded the property to the defendant, but under the importunities of her relatives, she asked, on the trial, that the 80 acres be deeded back to her, not for herself, but in order that she might have more land to distribute to the rest of the relatives. She at no time ever expressed any dissatisfaction with her conduct in deeding the land to her favorite nephew until she was besieged by the assembled multitude of impatient relatives who could not wait for their share until she died, and even then the grantor only asked that the land be *deeded back* to her, not for herself, but that she might, in compliance with the demands of her relatives, distribute the land to them.

II. A vigorous attack has been made upon the mentality of the grantor at the time the deed was made. It will serve no good purpose to quote at length from the voluminous record on

the subject. The entire record has been carefully examined, and the conclusion is unhesitatingly reached that the grantor was of sound mind, as contemplated in law.

At the time the deed was executed, true enough, the grantor was about 80 years of age. She was living alone. Her age brought on its ordinary physical infirmities. The record tends to show that she never was a very particular housekeeper, and undoubtedly, as age came on, she became more or less indifferent to such things. Her dress was not of the latest vogue and, in common with many elderly people, she had her personal peculiarities.

The record very satisfactorily shows that she had a definite remembrance and knowledge of her very numerous nieces and nephews. She knew the whereabouts of all her relatives and undoubtedly knew much about their financial situation, because "Aunt Mary," as she was called, was much besieged, at various times, by many of her relatives, for loans and favors. The record shows that she had accumulated about $22,000.00 of an estate in addition to her 240 acres of land. She had numerous loans on real estate which she looked after, with some slight assistance, from time to time, by her banker or loan agent, or a relative. She knew all about these loans in the minutest detail. She was very frugal and economical, as is often the case with elderly people who no longer listen to the calls and dictates of social customs.

The will which she made March 14, 1930, was admitted to probate without contest. It is significant that of the twelve nieces and nephews, eleven of whom were interested in having the deed set aside, as it would inure to their benefit on her death, none took the witness stand to express their opinion as to her alleged incompetency. Two of the twelve did take the stand and testify that she was competent. Her five brothers, some of whom attended the trial, were not called to testify as to her alleged incompetency. Mr. Keating, the guardian, nowhere testified that the grantor was incompetent. Eighteen witnesses testified that they believed the grantor was of sound mind. The family physician who had attended the grantor for many years for minor ailments, although apparently in the neighborhood, was not called as a witness. Three or four witnesses testified that they thought her of unsound mind. These opinions

were based upon trifling details, such as that she was said at one time to express a fear that some one would steal her grapes; that her memory was not as good as formerly, and in her conversation she, at times, "jumped from one subject to another," and that she did not take as good care of herself and home as she did in former years, and that she was not as cleanly in her person and dress as in former years. A real estate agent had trouble with her because she insisted on knowing the details of the business he was transacting for her. Even the central figure in the controversy, her niece, the stenographer, the one who called in the relatives, and who, more than anyone else, was responsible for this transaction, when pressed for a definite answer, said:

"Q. You claim to the court, in your opinion she is not of sound mind now? A. I would say to the court that she is not capable of taking care of her business affairs."

 As was said by this court in Albaugh v. Shrope, 197 Iowa 844, l. c. 857:

"The plaintiffs have the burden of establishing the mental incapacity of the deceased, and this they must do by proof that is clear, convincing, and satisfactory, before her deed can be set aside on that ground."

In Crawford v. Raible, 206 Iowa 732, l. c. 742, this court said:

"The courts zealously guard the right of every person to dispose of his property as he sees fit, so long as he has the mental capacity to know what property he possesses and what he desires to do with it. Coughlin v. St. Patrick's Church, 201 Iowa 1268. See, also, Overmyer v. Overmyer, 191 Iowa 1011; Sutherland State Bank v. Furgason, 192 Iowa 1295."

See also In re Will of Johnson, 201 Iowa 687; In re Estate of Paczoch, 202 Iowa 849; Wolfe v. Shroyer, 206 Iowa 1021; Hult v. Home Life Insurance Co., 213 Iowa 890.

Many other cases might be cited, announcing the same rules.

The plaintiffs have failed to successfully carry the burden uniformly imposed upon them in cases of this kind. There is no

1348

evidence warranting a finding of fraud or undue influence. The grantor had a very complete knowledge of her property. She knew the value of all she had. She fully realized her relationships. She fully understood just what she was doing and the consequences thereof when she made and delivered the deed in question.

Further elaboration is unnecessary. Upon a careful examination of the entire record, we find that the trial court correctly ruled, and the cause must be, and is,—Affirmed.

EVANS, DE GRAFF, MORLING, and KINDIG, JJ., concur.

CHIEF JUSTICE WAGNER not participating.